2014 VT 25

# Sandra J. Murphy, Personal Representative and Administrator of the Estate of Christopher Murphy v. Sentry Insurance

[95 A.3d 985]

Nos. 12-335 & 12-384

Present: Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.

Opinion Filed March 7, 2014

*Steven A. Bredice* of *Powell Orr & Bredice PLC*, Williston, for Plaintiff-Appellant.

*Robert G. Cain* and *Andrew A. Beerworth* of *Paul Frank + Collins P.C.*, Burlington, and *Christopher J. Lynch* of *LeClair-Ryan*, Hartford, Connecticut, for Defendant-Appellee.

¶ 1. **Burgess, J.** Plaintiff Sandra J. Murphy appeals from a superior court decision that vacated a jury verdict in her favor and entered judgment as a matter of law for defendant Sentry Insurance. Plaintiff contends that there was sufficient evidence to establish Sentry's liability for her husband's workplace death under the Restatement (Second) of Torts § 324A based on a negligent inspection theory. Plaintiff also argues that the court erred in awarding costs to Sentry. We affirm.

¶ 2. Decedent died in 2004 after a forklift he was operating for his employer, Pete's RV Center, tipped over. Pete's is a recre-

ational vehicle dealership in Williston, Vermont, owned by David McGinnis and Terry Shepard. At the time of the accident, the decedent was operating a forklift equipped with an unapproved towing attachment, and using the forklift to tow a fifth-wheel camper. In its capacity as Pete's general liability insurer, Sentry had performed a safety survey at Pete's in April 2002. Plaintiff sued Sentry, alleging in relevant part that Sentry was negligent in performing the April 2002 safety survey because it failed to identify and warn of the dangers of using forklifts with unapproved towing attachments.

¶ 3. The following evidence was presented at trial. As indicated, as of April 2002, Sentry was employer's general liability insurer only. That month, Gary Smith, a senior safety consultant with Sentry, met with owner McGinnis at Pete's for an initial safety consultation and survey. At that time, Pete's indoor facility consisted of a large building containing a showroom, offices, a parts department, and an RV products store, as well as a service department with a welding unit, numerous tools and one Toyota forklift. The outdoor premises included a six-acre lot with between 150 and 200 RVs, trucks with tow hitches, and a propane filling station.

¶ 4. Smith testified at trial that as a general matter, the purpose of Sentry's free loss-prevention services was to "assist the insured . . . with their safety program. It's really a value added service that [Sentry] provide[s] for [its] customers." Smith also stated, generally, that these services promote employee safety, that Sentry tries to improve employee safety at the businesses that Sentry insures, and that Sentry's services are "strictly as advisory in nature. It's a consultation visit . . . it's not mandatory." McGinnis understood that to control losses and promote safety for Pete's employees and managers Sentry would "look around the dealership, see if we had any issues that might be a potential safety problem or claim, future claim for the company."

¶ 5. Smith explained Sentry's standard inspection procedure as follows. First, Smith would deliver and review various education materials, such as safety and health guidelines and write-ups on miscellaneous safety areas. He would then review Sentry's "Safety at Your Service" website, and inquire how Sentry could assist the insured. Next, Smith would take a "brief walkthrough" of the insured's premises. Smith noted that Sentry informed the insured that Sentry was "not their safety program," and that the walk-

through was "strictly advisory in nature" and "certainly not a floor-to-ceiling or wall-to-wall" inspection. Smith reiterated that it was "a walkthrough making general observations. If we see something out of the ordinary that could produce a loss producing situation then . . . we'll stop. We'll talk about it. And we'll make the appropriate recommendation."

¶ 6. At the time of his inspection of Pete's, it was standard for Smith to take hand-written notes and fill in blanks on a pre-printed "loss control form" to memorialize his observations. Though Smith testified that he had no independent recollection of the April 2002 inspection at Pete's, his report stated that equipment in the service department included one forklift, which was established at trial to be a Toyota forklift. Asked if he saw any attachments for the forklift, Smith stated, "[a]ccording to my report I did not, because if I had seen any attachments there would have been a reference to that in my report."

¶ 7. The location of the forklift tow attachment at the time of Smith's visit was discussed extensively at trial. Owner Shepard did not accompany Smith on his walkthrough, but he testified that the forklift was parked in a designated spot when not in use. Shepard stated that on a typical day, "[t]here would probably be somebody on the forklift almost all the time all day" and that if the forklift was not unloading a delivery truck "then the attachment would be on it." Both McGinnis and Shepard testified that they had no recollection of discussing the forklift attachment with Smith. McGinnis had no memory that he or Smith observed a forklift in operation during the April 2002 visit, and there was no evidence to dispute Smith's testimony that, based on his report, he observed no tow attachment at Pete's.

¶ 8. Whether Smith saw or should have seen the forklift attachment is connected to notice of the attachment's purpose, illegality, and the role it was claimed to ultimately play in the June 2004 fatality. Pete's employees used the Toyota forklift with the tow attachment to move RV inventory around the lot. Shepard built the attachment for the Toyota forklift and decided that it was safe to use. It is undisputed that Pete's was not authorized by the forklift manufacturer to add the after-market tow attachment, and that its unapproved use violated the law.

¶ 9. After the April 2002 inspection, Smith followed up on his survey of Pete's in an April 16, 2002 letter. The letter noted that Smith's visit had been in connection with Sentry's general liability

insurance coverage. It further listed four motor-vehicle claims creating losses from 1999 to 2000, and observed that an "analysis of losses reflects that a motor vehicle safety program should be developed along with a driver training program." The letter also confirmed that Smith discussed Sentry's website and provided information on how Pete's could obtain additional information regarding the website and order safety lessons.

¶ 10. The letter made the following five recommendations, which were "offered to assist [Pete's] in controlling [its] losses": (1) protect the propane gas station against collision and fence it to prevent tampering; (2) develop and communicate a written vehicle-safety policy; (3) schedule driver meetings to demonstrate management interest in a safe driving record; (4) require employees to sign a sexual harassment policy; and (5) conduct a security evaluation and implement measures to detect and deter theft or vandalism of inventory.

¶ 11. In March 2004, almost two years after Sentry's general liability inspection, Pete's acquired two Yale forklifts intended for use in a remote warehouse. As he did for the Toyota forklift, Shepard built tow attachments for the Yale forklifts to move RVs. The Yale forklifts were much smaller and less stable than the Toyota, and were more prone to tip over when used with the attachments.

¶ 12. The accident that killed plaintiff's husband occurred on June 15, 2004. On that day, the decedent was using a Yale forklift to tow an RV at the warehouse. As he proceeded down a ramp, the unit jackknifed and the forklift flipped, landing on top of him. Following the accident, Sentry inspected Pete's and sent a follow-up letter with urgent new recommendations to avoid the use of after-market forklift attachments prohibited by law and emphasizing the danger of such unauthorized modifications.

¶ 13. McGinnis testified that, had Sentry warned Pete's of the dangers associated with using an unapproved attachment on the forklift, "We would have listened. We would have talked about it." Asked if he would have taken the forklift out of service if cautioned that this equipment was dangerous and a threat to employee safety, he answered "[i]t's hard to say. . . . [A]t the time, it was the only method we had for moving units. So it's difficult to say . . . how we would have answered that . . . ." Counsel further inquired: "[I]f you were told that it presented . . . an employee hazard as expressed eventually in the [post-accident]

letter that you received from Sentry, would you have ignored that warning or would you have heeded it and begun to find a replacement for the forklift?" McGinnis answered: "Yes. We would have taken it seriously and at least started looking at all alternatives." Shepard testified that had Sentry informed Pete's, as it did after the accident, of the danger of unapproved forklift attachments, Pete's would not have purchased the Yale forklifts or fabricated towing attachments for them.

¶ 14. In her lawsuit, plaintiff alleged in relevant part that Sentry was negligent in its April 2002 inspection because it failed to discover and warn Pete's about the danger of using unapproved towing attachments. Sentry moved for judgment as a matter of law at the close of the evidence, which the court denied. The jury found in plaintiff's favor on the negligence claim.

¶ 15. ▇ Sentry subsequently renewed its motion for judgment as a matter of law, and the court granted its request. The court agreed with Sentry that there was no evidence to show Sentry's liability under § 324A of the Restatement (Second) of Torts (1965). That provision states:

> **Liability to Third Person for Negligent Performance of Undertaking.**
> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Vermont formally adopted § 324A in *Derosia v. Liberty Mutual Insurance Co.*, 155 Vt. 178, 182-83, 583 A.2d 881, 883 (1990).

¶ 16. Turning to the first prong of § 324A, the court concluded that there was no evidence upon which the jury could find an increased risk of harm based upon Sentry's actions, and nothing

Sentry did increased the risk that already existed. The court explained that Sentry did not affirmatively bless the use of the attachment or the forklift, and did not encourage its use. Sentry did not suggest changes to its use that made it more dangerous. There was no action by Sentry that created any greater risk than already existed from the use of the small forklift and homemade attachment to move huge vehicles as heavy as ten thousand pounds.

¶ 17. The court similarly concluded that there was no evidence to show that Pete's changed its position in reliance upon Sentry's safety survey. While plaintiff argued that continuing to use the same type of forklift attachment was a change in position, the court found that no reasonable jury could so conclude.

¶ 18. Finally, the court considered whether Sentry had "undertaken to perform a duty" that Pete's owed to the decedent. The court reasoned that the Restatement first requires an undertaking to provide services that the provider should recognize as necessary to protect a person or property, and then that the undertaking was to perform a duty owed by the other to a third person. It explained that both criteria must be met to establish liability.

¶ 19. In this case, the evidence showed that Sentry did offer some service to Pete's. The important question was what services Sentry undertook to provide, and whether those included performing at least part of Pete's duty to provide its employees with a safe workplace. The court concluded that the jury could not reasonably find that in conducting the April 2002 general liability inspection, Sentry took on even a portion of Pete's duty to provide a safe workplace for the decedent. Had this been a workers' compensation inspection, the court noted, it might have supported a claim that Sentry assured Pete's that its current workplace practices were adequate to protect its employees. The inspection at issue was not directed at workers' compensation claims, however, and thus, the focus was not on employee safety. Unlike *Derosia*, 155 Vt. 178, 583 A.2d 881, the court explained, which involved a series of workers' compensation inspections, Pete's could not have reasonably concluded that Sentry was taking on any part of its duty to provide a safe workplace for its employees. The general liability policy addressed claims against Pete's by third parties. The court concluded that the 2002 inspection was never designed to reduce claims related to employee safety, nor could the jury reasonably so conclude.

¶ 20. In reaching its decision, the court was unpersuaded by certain trial testimony cited by plaintiff. Plaintiff pointed to an exchange in Smith's deposition as evidence that the inspection at issue was designed to address employee safety. The court found the cited testimony to be general background testimony about the inspector's job and not directed to what Sentry did for Pete's. The testimony did not address the inspection in question, nor did it address the difference between a workers' compensation inspection and a general liability inspection. The court found the need for evidence about what Sentry undertook to do in this particular case, and thus, it concluded that the slim reed of testimony cited by plaintiff could not support the verdict here.

¶ 21. Aside from the lack of any affirmative evidence to support the idea that the inspection supplanted Pete's duty, the court noted that the relevant policy in place at the time of the April 2002 inspection stated that, while Sentry had the right to make inspections at any time, any inspections would "relate only to insurability" and Sentry did "not make safety inspections." The policy also provided that Sentry did "not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public."

¶ 22. The court also rejected plaintiff's assertion that the inspection covered the entire workplace. It found that the inspector walked through the workplace, but there was no evidence that he inspected every piece of equipment in the workplace or assessed how all of that equipment was used. There was no evidence that he inspected the forklift or attachment at issue in this case, or that he was asked or expected to do so. There was no reasonable basis, the court concluded, for the jury to find that as a result of the 2002 walkthrough, Sentry undertook to assure a safe workplace for Pete's employees, or to assure the safety of all the equipment that employees were using. Thus, for all of these reasons, the court granted Sentry's motion for judgment as a matter of law.

¶ 23. Following this decision, Sentry moved for costs. Plaintiff opposed the request, arguing that a defendant can never be awarded costs unless it recovers on a counterclaim. The court found this argument unsupported by the law. For reasons explained in more detail below, the court granted Sentry's motion and awarded Sentry $17,490.74 in costs. Plaintiff appeals from these decisions.

## I.

¶ 24. We begin with the court's decision to grant Sentry judgment as a matter of law. We review this decision de novo, using the same standard as the trial court. *Downtown Barre Dev. v. GU Mkts. of Barre, LLC*, 2011 VT 45, ¶ 8, 189 Vt. 637, 22 A.3d 1174 (mem.). "Judgment as a matter of law is appropriate where a party's claims hold no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party." *Schaad v. Bell Atl. NYNEX Mobile, Inc.*, 173 Vt. 629, 631, 800 A.2d 455, 458 (2002) (mem.) (quotation and alteration omitted). In conducting our analysis, we view the evidence "in the light most favorable to the nonmoving party" and "exclude the effects of any modifying evidence." *Id.* (quotation omitted).

¶ 25. To establish her claim, plaintiff needed to provide sufficient evidence to satisfy any subsection of § 324A of the Restatement. As set forth above, these Restatement provisions ensure that before a party "is held liable for negligent performance of his undertaking, he in some positive way must have contributed to the injury, either by increasing risk of harm, by interposing himself between another person and the duty that the other person owed to someone else, or by inducing reliance on his undertaking." *Blessing v. United States*, 447 F. Supp. 1160, 1199 (E.D. Pa. 1978) (citations omitted). We agree with the trial court that plaintiff did not provide sufficient evidence here to support a finding in her favor under any of the subsections of § 324A.

## A.

¶ 26. Plaintiff first argues that the jury could have reasonably concluded that Sentry's alleged negligent inspection increased the risk of physical harm to the decedent. According to plaintiff, Sentry should have warned Pete's in April 2002 of the risk posed by the use of unapproved forklift attachments. Plaintiff maintains that Sentry's "failure to warn" Pete's about this issue in 2002 increased the risk of the harm to the decedent because the attachment system was later transferred from the Toyota forklift to smaller, less stable, forklifts.

¶ 27. ■ We reject plaintiff's arguments. As we indicated in *Derosia*, 155 Vt. at 188, 583 A.2d at 887, a party must engage in negligent conduct that "directly increases risk of harm" to fall within § 324A(a). That is, a plaintiff must identify "sins of

commission rather than omission." *Patentas v. United States*, 687 F.2d 707, 716 (3d Cir. 1982); see also *Deines v. Vermeer Mfg. Co.*, 752 F. Supp. 989, 994 (D. Kan. 1990) ("To avail himself of [§ 324A(a)], plaintiff must show some affirmative action by the defendant."). "It is well established that mere negligence in failing to discover a danger on the part of a defendant, even if proved, would not subject the defendant to liability under § 324A(a)." *Deines*, 752 F. Supp. at 995 (citing cases). In a similar vein, liability will not be imposed simply because a defendant's alleged "failure to advise" permitted the continuation of an existing risk. *Id.* (citing cases); see also *Myers v. United States*, 17 F.3d 890, 902-03 (6th Cir. 1994) (holding that mere failure to detect another's violation of safety regulations, without more, does not give rise to duty under § 324A(a)); *Howell v. United States*, 932 F.2d 915, 919 (11th Cir. 1991) (holding that "for purposes of the section 324A 'good samaritan' doctrine, a risk is only increased when a nonhazardous condition is made hazardous through the negligence of a person who changed its condition or caused it to be changed") (quotation omitted).

¶ 28. ▆ ▆ As the *Myers* court explained:

> The test is not whether the risk was increased over what it would have been if the defendant had not been negligent. Rather, a duty is imposed only if the risk is increased over what it would have been had the defendant not engaged in the undertaking at all. This must be so because the preliminary verbiage in Section 324A assumes negligence on the part of the defendant and further assumes that this negligence caused the plaintiff's injury. If we were to read subsection (a) as plaintiffs suggest, *i.e.*, that a duty exists where the negligence increased the risk over what it would have been had the defendant exercised due care, a duty would exist in every case. Such a reading would render subsections (b) and (c) surplusage and the apparent purpose of all three subsections to limit application of the section would be illusory.

17 F.3d at 903. Thus, as the *Myers* court held, a party must prove facts showing that the alleged tortfeasor "affirmatively either made, or caused to be made, a change in the conditions which change created or increased the risk of harm." *Id.*

¶ 29. The *Patentas* court echoed these sentiments. In *Patentas*, the plaintiffs alleged that the Coast Guard negligently inspected a ship. The inspection occurred shortly before the vessel caught fire and exploded. The Coast Guard inspected the vessel to examine an area where an earlier fire had occurred and to determine if the vessel could safely continue discharging her cargo. The plaintiffs argued that a reasonable inspection would have disclosed the defects that caused the first fire; these same defects caused the later fire and explosion. The court rejected the argument that the Coast Guard increased the risk of explosion by failing to discover the cause of the earlier fire and failing to stop the discharge.

¶ 30. As indicated above, the court identified the critical defect as the plaintiffs' "inability to identify sins of commission rather than omission." *Patentas*, 687 F.2d at 716. Like the *Myers* court, it rejected a reading of the Restatement that required only a showing that a defendant's "failure to exercise reasonable care" increased the risk of harm. It noted, moreover, that "the comment to section 324A(a) makes clear that 'increased risk' means some physical change to the environment or some other material alteration of circumstances." *Id.* at 716-17. That critical component was lacking in *Patentas*.

¶ 31. Plaintiff's evidence here suffers from the same flaw. As an initial matter, the evidence falls short of preponderant to prove that Sentry should have noticed the tow attachment and its connection to the Toyota forklift, let alone that Sentry should have anticipated the risk of forklifts and forklift attachments not extant at the time of the inspection. Testimony that the Toyota forklift was probably operating during the inspection, and that the tow attachment would be in use unless the forklift was unloading a delivery, was insufficient as a matter of law absent any evidence of unloading activity to prove it more likely than not that the tow attachment was in play for the inspector to see. Even if the Toyota forklift had been noticed, there was no evidence that Sentry would or should have expected Pete's to apply the same kind of attachment to different and lighter forklifts acquired after the inspection at issue.

¶ 32. ▇ Similarly, assuming Sentry should have recognized and warned Pete's that the Toyota attachment was prohibited, it just does not follow that Sentry made it more likely that Pete's would later acquire and use less stable forklifts. Sentry did not cause or

sanction Pete's use of tow attachments on its forklifts to tow RVs. Indeed, the record fails to show that Sentry knew that a forklift attachment existed at Pete's at any time prior to the accident. Assuming that the risk of physical harm associated with the use of unapproved forklift attachments was present at the time of Sentry's inspection, nothing Sentry did *increased* the risk of physical harm to decedent from such attachments. We agree with the trial court that Sentry's liability cannot be premised on § 324A(a).

### B.

¶ 33. Plaintiff next argues that the jury reasonably could conclude that, through its inspection, Sentry assumed a portion of Pete's duty to provide a safe workplace to its employees. Likening this case to *Derosia*, plaintiff maintains that Sentry obligated itself to fill a safety gap in Pete's expertise and to address the safety of all users of Pete's, and that Sentry's liability disclaimers are ineffective. Citing a test set forth in *Blessing*, 447 F. Supp. at 1189, plaintiff also asserts that Sentry undertook to inspect the entire premises, which included the forklift, thereby giving rise to a duty to inspect and warn against the unlawful forklift attachment.

¶ 34. ■ ■ These arguments are unpersuasive. In assessing a party's liability under § 324A(b), one must examine the nature and extent of a party's undertaking. See, e.g., *Blessing*, 447 F. Supp. at 1189 (explaining that for liability to be imposed under § 324A, party must specifically undertake to perform task that he is charged with having performed negligently, and that extent of undertaking determines scope of act upon which liability may be premised). In this case, Sentry conducted a "safety survey" in its role as Pete's general liability insurer. There is no evidence to show that, by conducting this survey, Sentry undertook to perform a duty that Pete's owed to the decedent.

¶ 35. This case is not like *Derosia*, as plaintiff asserts. In *Derosia*, the plaintiff was injured while operating a table saw without a safety blade guard mechanism. He sued his employer's workers' compensation insurer, alleging that the insurer had negligently conducted safety inspections at the plant. Cf. 21 V.S.A. § 624(h) (providing that injured employees are now prohibited from suing workers' compensation insurance carriers for conduct-

ing workplace inspections except in the case of gross negligence or willful misconduct). Appealing from a jury verdict in the plaintiff's favor, the insurer argued that there was no evidence to show that it had undertaken or promised to provide safety inspection services for either the employer or the plaintiff. We rejected this argument, finding sufficient evidence to support the jury's verdict. *Derosia*, 155 Vt. at 186-88, 583 A.2d at 885-87.

¶ 36. In support of our decision, we cited evidence that the insurer had engaged in substantial loss-prevention activities with the employer and that it had considerable expertise in the field of workplace safety. We explained that the insurer's loss-prevention manager had regularly inspected the plant, and provided detailed reports to the employer that included a list of loss sources within the plant and "plans of actions" to address these issues. *Id.* at 183-84, 583 A.2d at 884. Although the insurer concluded that machines were a major source of injury, it made no recommendations to reduce or eliminate those injuries or risks. The insurer acknowledged that the employer had no particular expertise in safety or loss prevention and that the insurer would provide such expertise. The employer's personnel director confirmed that the employer relied on the insurer for particular expertise in safety matters. *Id.* at 184-85, 583 A.2d at 884-85.

¶ 37. In reaching our decision, we considered the insurer's argument that its contract did not contain any promise to assume the employer's duty to inspect, and that it in fact provided that the insurer had the right to conduct inspections without reliance by the employer on the results or recommendations following inspections. We agreed that the contract, standing alone, did not subject the insurer to liability for conducting inspections and advising the employer of the results of those inspections. *Id.* at 185-86, 583 A.2d at 885. But, for the reasons identified above, we rejected the notion that there was no evidence from which the jury could reasonably have concluded that the defendant undertook an obligation to provide a safe workplace, notwithstanding the statements in the written contract to the contrary. *Id.* at 186, 583 A.2d at 884-85. In sum, we found sufficient evidence of an undertaking to perform the duty owed by the employer, within the meaning of § 324A(b) of the Restatement, to support the jury verdict.

¶ 38. It is a much different situation here. First, Sentry was acting as a general liability insurer, not a workers' compensation

insurer. Thus, as the trial court emphasized, the policy at issue addressed claims against Pete's by third parties — it was never designed to reduce claims related to employee safety. The fact that some of Sentry's recommendations may have promoted employee safety as well as the safety of third parties was merely incidental; it does not change the focus or purpose of Sentry's visit. Additionally, Sentry representatives did not regularly inspect Pete's premises while acting as Pete's general liability insurer. Plaintiff relies on Sentry's single walkthrough of the premises with one of Pete's owners. Unlike the workers' compensation insurer in *Derosia*, moreover, Sentry did not regularly provide detailed reports to Pete's outlining "plans of action" to protect employee safety. The Sentry representative simply made note of several readily observable hazards on the premises during his single walkthrough, and made recommendations for reducing or eliminating those hazards. Finally, there is no evidence that Sentry acknowledged that the employer lacked any particular safety expertise or that Sentry would provide such expertise. Any suggestion that Pete's relied on Sentry for particular expertise in safety matters is unreasonable as a matter of law under these circumstances.

¶ 39. Notwithstanding plaintiff's assertion to the contrary, therefore, Sentry's role in this case was nothing like that of the workers' compensation insurer in *Derosia*, and no reasonable jury could find that Sentry offered or intended to assume any part of Pete's duty to conduct workplace inspections and provide a safe workplace. Having never undertaken a duty to ensure, through inspection, a safe workplace for employer, Sentry cannot be held liable for allegedly breaching such duty.

¶ 40. None of plaintiff's arguments compel a contrary conclusion. The evidence cited by plaintiff does not establish that Sentry undertook Pete's duty in this case to assure a safe workplace. Plaintiff cites testimony, for example, that "[t]he personal safety of all users of the premises is a top priority" for an insurance loss prevention inspector. As the trial court observed, this testimony was simply general background testimony about the inspector's job and it did not show what Sentry undertook to do in this particular case. Even if the "purpose" of Smith's visits was to promote employee safety, it does not follow that Sentry thereby undertook employer's duty to provide a safe workplace. Plaintiff also cites testimony from Smith that, had he known of the

unapproved forklift attachment, he would have recommended that Pete's discontinue using it. We fail to see how this statement supports the conclusion that Sentry undertook, through its 2002 safety inspection, to perform Pete's duty to ensure a safe workplace.

¶ 41. Moreover, the trial court did not hold, as plaintiff asserts, that Sentry was "insulated from its own negligence by its contractual disclaimers." It observed only that, consistent with all of the other facts presented in this case, the general liability policy stated that Sentry's inspections related only to insurability and that Sentry did not make safety inspections nor did it undertake to perform the employer's duty to provide for its employees' safety. The terms of the contract may not be dispositive, but they are certainly relevant, and they are properly considered with all of the other evidence in this case. Obviously, if Sentry's activities had been like those of the workers' compensation insurer in *Derosia*, the court might have found any contractual disclaimers unavailing. But this case is not like *Derosia*, as explained above.

¶ 42. In support of her argument, plaintiff also cites a test set forth in *Blessing*, which provides a more specific formulation of the basic tort rule that "duty is measured by undertaking." 447 F. Supp. at 1189. The *Blessing* court held that "an employee can recover for a negligently performed inspection only where the inspector has physically undertaken to inspect (1) the specific instrumentality causing the injury, or (2) the entire physical plant of which the specific instrumentality is a part." *Id.* Assuming this standard applies, plaintiff's proof failed to meet it.

¶ 43. ▌ There was no evidence to show that the inspector undertook to inspect the forklift or the forklift attachment, mindful that this was not even the same forklift or attachment as that involved in the decedent's accident. Indeed, there was insufficient evidence to prove that Smith actually saw the tow attachment. Plaintiff cites testimony in which Pete's owners theorized that on a "typical day," "[t]here would probably be somebody on the forklift almost all the time all day," and that if the forklift was not being used to unload a truck, "then the attachment would be on it." Plaintiff also cites testimony that the forklift was parked in a designated spot if it was not being used, and that the attachment was not kept in a particular place. A Pete's employee

testified that "[u]nder normal conditions," the attachment remained on the forklift, and that when the attachment was removed, it was "stored on the ground outside the building." This generalized testimony does not prove it more likely than not that, on the particular day and time in question, Smith saw the attachment. See, e.g., *Winter v. Unaitis*, 124 Vt. 249, 252, 204 A.2d 115, 117 (1964) ("Evidence which merely makes it possible for the fact in issue to be as alleged, or which raises a mere conjecture, surmise or suspicion, is an insufficient foundation for a verdict."); *Burke v. N.P. Clough, Inc.*, 116 Vt. 448, 450, 78 A.2d 483, 485 (1951) ("[C]onjecture is no proof in him who is bound to make proof.").

¶ 44. There was similarly no evidence to show that the inspector undertook to inspect the entire physical premises to discover any safety hazards that might exist, including any hazards associated with the Toyota forklift. Any suggestion to the contrary is, as the trial court found, an exaggeration of what actually occurred. As stated above, the Sentry inspector walked through the premises with one of the owners of Pete's, and took note of several obvious hazards. Given the nature of his safety survey, we reject plaintiff's contention that Smith had a "duty to inquire" about the forklift. We agree with the trial court that the jury here could not reasonably have concluded from the evidence that in conducting its 2002 inspection as Pete's general liability insurer, Sentry thereby assumed any portion of Pete's obligation to provide a safe workplace for the decedent.

## C.

¶ 45. Finally, plaintiff argues that Pete's relied on Sentry's safety inspection, and was thereby induced to forego correcting the danger created by the forklift attachment. In support of this contention, plaintiff points to evidence that: Pete's personnel believed Sentry's inspections were for safety purposes; Pete's viewed Sentry as having superior safety expertise; Pete's promptly read and reacted to safety issues identified in Sentry's safety report; and, unaware of any danger, Pete's co-owners permitted family members to use the forklifts. According to plaintiff, the jury could reasonably have found that Pete's owners believed that Smith saw the tow attachment during his safety survey, and that Smith had decided that it was not a safety issue. They then "relied" on this and continued their practice of using forklifts with unapproved attachments.

¶ 46. ■ These arguments are unavailing. Any reliance on the safety survey for the purposes cited by plaintiff would be unreasonable as a matter of law. No reasonable employer could believe under the circumstances here that Smith had identified all existing hazards on the premises or that he had implicitly approved the use of unauthorized towing attachments. As previously discussed, there was no evidence to show that Smith even saw the towing attachment. And indeed, a different forklift and a different towing attachment were involved in the decedent's accident. As Sentry points out, moreover, there was undisputed evidence presented at trial that Pete's had its own designated safety director and its own safety program. Part of Pete's safety program was specifically tailored to forklift operation and materials handling practices. Even if plaintiff could show that Pete's neglected or reduced its own safety program in reliance on Sentry's inspection, which she cannot, any such reliance would be unjustified. Thus, for all of the reasons discussed above, we find no error in the trial court's decision to grant judgment to Sentry as a matter of law.

## II.

¶ 47. We turn next to plaintiff's assertion that the trial court erred in awarding Sentry $17,490.74 in costs. Plaintiff argued below that Sentry, or any other defendant, must recover something on a counterclaim before it could be awarded costs under Vermont Rule of Civil Procedure 54. The court rejected this argument, characterizing plaintiff's interpretation of case law and the rules as tortured. The court found that costs were routinely awarded to a defendant when there was a defense verdict. As to the actual amount of costs requested, the court noted that plaintiff did not argue until her third memorandum on the motion for costs that any of the specific items of costs sought by ·Sentry were inappropriate. The court agreed with plaintiff that Sentry was not entitled to certain deposition costs, but found that plaintiff offered no support for her proposed deduction of other itemized costs. The court explained that filing fees and service fees were routinely awarded to the successful party in a lawsuit, and it found no reason to treat the mediator's fee differently.

¶ 48. As she did below, plaintiff challenges Sentry's status as a "prevailing party" and its general entitlement to costs under Rule 54. As part of this argument, plaintiff asserts that, because Sentry is not a "prevailing party," the court could award Sentry only its

reasonable deposition expenses under Rule 54(g). We review the court's ruling for abuse of discretion. *Peterson v. Chichester*, 157 Vt. 548, 553, 600 A.2d 1326, 1329 (1991). There was no abuse of discretion here.

¶ 49. Rule 54(d)(1) provides that "[c]osts other than attorneys' fees shall be allowed as of course to the prevailing party, as provided by statute and by these rules, unless the court otherwise specifically directs." Rule 54(d) is based both on Maine Rule of Civil Procedure 54 and Federal Rule of Civil Procedure 54. See Reporter's Notes, V.R.C.P. 54; see also F.R.C.P. 54(d)(1) ("Unless a federal statute, these rules, or a court order provides otherwise, costs — other than attorney's fees — should be allowed to the prevailing party."); M.R.C.P. 54(d) ("Costs shall be allowed as of course to the prevailing party, as provided by statute and by these rules, unless the court otherwise specifically directs."); see also Me. Rev. Stat. tit. 14 § 1501 (providing in part that "[i]n all actions, the party prevailing recovers costs unless otherwise specially provided"). The rule does not define what it means to "prevail" in litigation.

¶ 50. ■ Plaintiff reads the rule as a limitation. Plaintiff argues that the rule's phrase "prevailing party, as provided by statute and by these rules" means a party can recover costs only if "provided by statute and these rules." She argues that there is only one relevant statute and one relevant rule, and that neither authorizes recovery of costs by defendant in the circumstances of this case. The statute, 32 V.S.A. § 1471(a), provides: "There shall be taxed in the bill of costs to the recovering party . . . a fee equal to the entry fees, the cost of service fees incurred, and the total amount of the certificate of witness fees paid." Plaintiff argues that the statute does not apply because defendant is not a "recovering party." The rule, Vermont Rule of Civil Procedure 68, applies when there is an offer of judgment and provides that "[i]f the judgment finally obtained by the offeree is not more favorable than the offer [of judgment], the offeree must pay the costs incurred after the making of the offer."[1] There is no offer of judgment in this case.

---

[1] Plaintiff also asserts that "Vermont follows the 'American Rule,' under which parties must generally bear their own costs and attorney's fees," which requires a strict construction of Rule 54(d)(1), Rule 68, and 32 V.S.A. § 1471. It is true that Vermont follows the American Rule, *In re Gadhue*, 149 Vt. 322, 327, 544 A.2d 1151, 1154 (1987), but costs and attorney's fees are distinct, and Rule 54(d)(1) authorizes

¶ 51. To analyze plaintiff's argument, we must start with the state of the law before we adopted Rule 54. At common law, as adopted in this state, costs were available to the prevailing party at the discretion of the court. See 1 V.S.A. § 271 (adopting the common law); *Comstock's Adm'r v. Jacobs*, 89 Vt. 510, 512, 96 A. 4, 5 (1915); see also *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 606 n.8 (2001). Thus, for remedies recognized at common law, the availability of costs did not rely upon statutory recognition. See *Comstock's Adm'r*, 89 Vt. at 512-13, 96 A. at 5-6; see also *Kelley v. Hoosac Lumber Co.*, 96 Vt. 153, 159, 118 A. 520, 521 (1922) (reiterating that appellate costs can be recovered at common law under "the well recognized general rule, that costs are to be taxed for the prevailing party"), *overruled on other grounds, Grenier v. Alta Crest Farms, Inc.*, 115 Vt. 324, 58 A.2d 884 (1948). The common law in this respect could be supplemented by statute. *Comstock's Adm'r*, 89 Vt. at 512, 96 A. at 5. The same rules prevailed in equity. *Doty v. Vill. of Johnson*, 84 Vt. 15, 23-24, 77 A. 866, 869 (1910).

¶ 52. As stated above, Rule 54(d) was originally based upon the identically worded Maine rule. Unlike Vermont, however, Maine had enacted a statute that codified the common law and awarded costs to the prevailing party unless otherwise provided by statute. See Me. Rev. Stat. tit. 14 § 1501. Thus, the wording of the Maine rule did not have to reflect the governance of the common law. In adopting the Maine language, there is no indication of an intent to supersede the common law, assuming that it was possible for a judicial rule to supersede the common-law remedy. The rule allows costs to the "prevailing party" with no suggestion that a successful defendant cannot be a prevailing party,[2] and the Reporter's Notes state: "The provision confirms

---

costs, not attorney's fees. *Id.* at 327, 544 A.2d at 1153-54 ("While our courts have relatively broad discretion in awarding costs in litigation, . . . attorney's fees are considered litigation expenses — not costs — and are not as freely taxed to the opposing party by one who prevails in a particular matter."); see V.R.C.P. 54(d)(1) ("Costs *other than attorneys' fees* shall be allowed as of course to the prevailing party." (emphasis added)).

[2] We have in the past affirmed the award of costs to a prevailing defendant under Rule 54(d). See *Ianelli v. Standish*, 156 Vt. 386, 592 A.2d 901 (1991). The plaintiff did not, however, challenge in that case the defendant's right to any award of costs on the argument made by plaintiff here.

that costs are awarded as of course." In any event, language of a statute or rule will not "change common law by doubtful implication; it is only overturned by clear and unambiguous language." *State v. Brown*, 147 Vt. 324, 327, 515 A.2d 1059, 1061 (1986). We do not find in Rule 54(d)(1) the unambiguous language to overturn the common-law rule on costs. That construction is supported by the absence of any evidence of an intent to overturn the common law rule allowing costs to prevailing defendants.

¶ 53. ▇▇ Sentry plainly obtained a judgment in its favor in this common-law negligence action, and there can be no question that Sentry was the prevailing party. Cf. *Seacoast Hangar Condo. II Ass'n v. Martel*, 2001 ME 112, ¶ 31, 775 A.2d 1166 (explaining that in determining which party has "prevailed" for purposes of recovering costs, trial court "must look at the lawsuit as a whole to determine which party was the 'winner' and which the 'loser' " (quotation omitted)). As the prevailing party, the court had discretion to award Sentry its costs. See *Chichester*, 157 Vt. at 553, 600 A.2d at 1329 (citing V.R.C.P. 54(d) (costs allowed, "unless the court otherwise specifically directs")); see also *Greenlaw v. Rodney Stinson Post No. 102*, 567 A.2d 75, 76 (Me. 1989) (recognizing, under identical rule, that trial court has wide discretion in determining type and amount of costs recoverable by prevailing party in civil action); *Teel v. Young*, 389 A.2d 322, 324 (Me. 1978) (finding Maine rule "greatly similar" to federal rule, and concluding that rule and relevant statute "clearly contemplate that the allowance of costs to a prevailing party is almost automatic" while "disallowance of costs is something in the nature of a penalty," and citing federal cases so holding).

¶ 54. Plaintiff's challenge to the cost award rests solely on her mistaken premise that Sentry is not a "prevailing party." Based on this assertion, she maintains that the trial court lacked authority to award anything but reasonable deposition costs under Rule 54(g). For the reasons set forth above, this argument fails. Plaintiff has not shown that the court abused its discretion in awarding costs here.

*Affirmed.*