NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 125

No. 2017-387

| | |
|---|---|
| Willis S. Sheldon, Individually and as Administrator of the Estate of Dezirae Sheldon | Supreme Court |
| v. | On Appeal from Superior Court, Rutland Unit, Civil Division |
| Nicholas Ruggiero | March Term, 2018 |

Helen M. Toor, J.

Thomas W. Costello, Sharon J. Gentry, and Adam W. Waite of Costello, Valente & Gentry, P.C., Brattleboro, for Plaintiff-Appellant.

Sandra A. Strempel and Kendall Hoechst of Dinse, Knapp & McAndrew, P.C., Burlington, for Defendant-Appellee.


PRESENT: Reiber, C.J.,[1] Skoglund, Robinson, Eaton and Carroll, JJ.


¶ 1.  **ROBINSON, J.**  Plaintiffs Willis S. Sheldon, individually as the father of Dezirae Sheldon, and as administrator of the Estate of Dezirae Sheldon, appeal from the grant of summary judgment to defendant Nicholas Ruggiero, an administrative reviewer with the Vermont Department for Children and Families (DCF). Plaintiffs argue that defendant negligently failed to report an allegation that Dezirae's stepfather Dennis Duby (Duby) had abused Dezirae, eventually leading to Dezirae's murder at Duby's hands. Plaintiffs present alternative theories for defendant's liability under: (1) Vermont's mandated-reporter statute, which they argue creates a private right

---

[1] Chief Justice Reiber was present for oral argument, but did not participate in this decision.

of action; (2) common-law negligence; or (3) negligent undertaking. We conclude that even if the mandated-reporter statute creates a private right of action, or alternatively, even if defendant had a common-law duty to report suspected abuse, plaintiffs' negligent-undertaking claim fails because defendant acted reasonably and prudently in his role as a DCF administrative reviewer. In addition, we conclude that plaintiffs' claim fails because defendant never undertook DCF's statutory obligation to investigate all potential sources of Dezirae's injuries. Accordingly, we affirm.

¶ 2.     The undisputed evidence in the summary-judgment record reflects the following. In February 2013, Dezirae, then a one-year-old infant, was brought to the hospital with blunt-force fractures to both of her legs. DCF investigated for suspected child abuse. See 33 V.S.A. § 4915 (mandating DCF assessment and investigation "[u]pon receipt of a report of abuse or neglect"); id. § 4915b (outlining procedures for investigation). During the course of its investigation, mother offered various explanations to the DCF investigator, including that in the days preceding the injuries she was the only caregiver to Dezirae; mother "did not do this and she never saw anyone do anything to [Dezirae]"; mother had accidentally dropped Dezirae into a crib while changing her; Dezirae had fallen off of a chair and a couch on two separate occasions; on one occasion, Dezirae began to crawl toward a stairwell and mother "grabb[ed] her and yank[ed] her back" by her legs and one arm, which caused Dezirae's legs to hit a doorframe; and mother had not slept in two days and "had to do it," without providing further explanation for this statement.

¶ 3.     Dezirae's paternal aunt reported to DCF that mother had said that she fabricated the story to DCF regarding pulling Dezirae away from the stairs "because [mother] felt like she needed to come up with a story" and "that actually [mother believed] the demons had thrown Dezirae down the stairs." DCF spoke to mother's then-boyfriend Duby, who noted that a month previously he had dropped Dezirae from a height of approximately one foot into her crib. He reported that she did not cry or seem bothered at all. DCF additionally interviewed the father of mother's other

2

child; he had noticed bruising on Dezirae's face and was told by mother that Duby had dropped Dezirae into a portable crib about two weeks earlier. This allegation was consistent with a report from his wife—a legal guardian of Dezirae's—that reflects the same information.

¶ 4. The doctors who treated Dezirae reported that the leg fractures were not consistent with an accidental event, were caused by different types of force at different times, and were at least a week old before Dezirae was brought to the hospital. Based on this information and that noted above, DCF gained temporary custody of Dezirae in February 2013 and placed her in a home outside of mother's care.

¶ 5. In April 2013, based on the recommendation of the DCF investigator who had done the interviews described above, DCF substantiated physical abuse and medical neglect against mother. Regarding physical abuse, the case determination report explained that the medical evidence showed that the injuries were not accidental and that mother "stated that she ha[d] been the only caregiver for Dezirae." Regarding medical neglect, the report noted that mother had admitted that "she knew Dezirae was injured for several days" but "did not seek medical treatment because she was afraid she would get into trouble."[2]

¶ 6. In May 2013, mother sought administrative review of the substantiation of the report that she engaged in physical abuse and medical neglect. See 33 V.S.A. § 4916a(c)(1). Defendant, an independent contractor with DCF, was the administrative reviewer assigned to the case. An administrative reviewer is "a neutral and independent arbiter who has no prior involvement in the original investigation of the allegation," id. § 4916a(f), and is tasked with determining whether to reject or accept DCF's substantiation or "place the substantiation determination on hold and direct [DCF] to further investigate the case based upon the

_____

[2] In April 2013, mother was charged with, and eventually pled guilty to, cruelty to a child. 13 V.S.A. § 1304.

3

recommendations of the reviewer." Id. § 4916a(g)(1)-(3). The parties do not dispute that a DCF administrative reviewer is statutorily mandated to report suspected child abuse. Id. § 4913.

¶ 7. DCF placed Dezirae back into mother's care in early October 2013. Subsequently, also in October 2013, defendant met with mother for her administrative-review conference. See Id. § 4916a(d)-(e). During this interview, and in a similar fashion to her earlier interview with DCF, mother offered various, conflicting accounts for Dezirae's injuries—including that mother originally did not know what happened and made up a story because she felt obligated to provide one, that the injuries could have happened while Dezirae was at her maternal grandmother's home, and that her then-boyfriend Duby had caused the injuries.

¶ 8. After the interview, defendant spoke with the DCF investigator who had recommended substantiating the abuse claims against mother. His goals in speaking to her were to learn more about Duby and whether he had been substantiated for abuse, and to give the investigator a chance to weigh in on which of mother's versions was accurate.[3] In this

---

[3] Defendant asserts in his brief that "[i]t is not uncommon for Administrative Reviewers to meet with investigators or other DCF personnel to discuss their thoughts before making a final substantiation determination because relevant information may not make it into the written record." Nothing in the statutory scheme, see 33 V.S.A. § 4916a, or the DCF regulatory scheme concerning the administrative review process, see Procedures for Conducting an Administrative Review § 3005, Code of Vt. Rules 13 172 300, allows for the administrative reviewer to have ex-parte, extra-record contact with DCF caseworkers concerning the subject of the substantiation review. Indeed, the entire statutory framework for administrative review of a DCF abuse substantiation suggests that the Legislature intended a baseline of due process for the subject of the substantiation. Notably, under the applicable statute, the subject of the substantiation is given a redacted copy of the investigation file, which reinforces the notion that they are entitled to notice of the evidence against them. 33 V.S.A. § 4916a(d). The subject's conference with the administrative reviewer gives them a chance "to present documentary evidence or other information that supports [the subject's] position and provides information to the reviewer in making the most accurate decision regarding the allegation." Id. § 4916a(e). The statute and rules do not authorize the reviewer to conduct any independent investigation but, instead, give the reviewer the opportunity to "place the substantiation determination on hold and direct [DCF] to further investigate the case based upon the recommendations of the reviewer." Id. § 4916a(g)(3). Moreover, the administrative reviewer is supposed to be neutral and independent, with no prior involvement in the original investigation. Id. § 4916a(e). The apparent custom followed by defendant and cited in defendant's brief creates a situation where, as here, the administrative-review decision is at least partially based on extra-record evidence about which the subject has no

4

conversation, he indicated to the investigator that mother had claimed that Duby had caused the injuries. The caseworker explained that she felt mother was the culprit due to the differing accounts she had provided to DCF. Defendant, who had read the DCF investigation intake report, agreed with the caseworker's assessment and thought that mother was lying because both during DCF's investigation and during mother's interview with defendant she gave varying, inconsistent explanations—one of which involved Duby—that were not consistent with how the injuries actually occurred.[4]

¶ 9. In a written decision issued on December 5, 2013, and copied to the Commissioner of DCF, defendant upheld DCF's substantiation of abuse and medical neglect against mother. The decision noted mother's position that she "did not know what happened to [Dezirae]," and "[pled] guilty to the medical neglect," but, "[a]s far as the broken bones it was [her] boyfriend that dropped her not [mother]." In support of upholding the substantiation, the decision cited mother's admission during her administrative-review conference to purposely lying to detectives; the medical evidence that the fractures were not accidental and occurred at different times; mother's knowledge of Dezirae's injuries for several days before seeking treatment; mother's role as "sole caretaker" to Dezirae; and her "inconsistent explanations regarding how [Dezirae] received two fractured legs."

¶ 10. DCF relinquished custody of Dezirae to mother in early February 2014. Within a matter of weeks, Dezirae was brought to the hospital with skull fractures to both sides of her head.

---

notice or opportunity to respond. This appears to be inconsistent with the applicable statutory and regulatory protections of the subject. If this is truly an accepted custom at DCF, the Department should review its policies and practices in light of the applicable law.

[4] Defendant subsequently followed up with a different DCF caseworker because he was curious as to why Dezirae had been placed back into her mother's care. That caseworker opined to him that mother had not caused the fractures to Dezirae's legs.

These injuries ultimately proved fatal. Duby, who by this time was Dezirae's stepfather, was charged with her murder. He was ultimately convicted after pleading guilty.

¶ 11. In February 2016, plaintiffs sued defendant, arguing that he had negligently failed his statutory obligations as a mandated reporter to report to DCF mother's allegation that Duby had caused Dezirae's leg injuries, which she made during the administrative-review conference. This failure to report, plaintiffs alleged, denied DCF the ability to adequately evaluate Dezirae's placement back into mother's care. In addition, plaintiffs contend that defendant undertook a duty to Dezirae—which he breached—when he decided to follow up with the DCF caseworker and "informally report and investigate" mother's allegation against Duby.

¶ 12. Defendant moved for summary judgment in March 2017, arguing that he was not liable because the mandated-reporter statute does not create a private right of action; defendant was not obligated in 2013 to make a new report of abuse because Duby was not a new suspect; defendant's report complied with the statute; and DCF's failure to act on mother's allegation about Duby was an intervening event. Defendant additionally contended that plaintiffs' negligent-undertaking claim failed because he "did not 'undertake' to 'render services' " to Dezirae or plaintiffs or do so in a manner that increased the risk of harm.

¶ 13. The trial court granted summary judgment to defendant in September 2017. The court concluded that the mandated-reporter statute does not impliedly create a private right of action; that, in the absence of the statute creating a private right of action, plaintiffs could not use defendant's failure to report as the basis for a common-law-negligence claim; and that defendant had not engaged in an actual "undertaking" to "perform [defendant's] investigation in the service of another" in a manner that "create[d] or increase[d] a risk of harm to Dezirae." This timely appeal followed.

¶ 14. We review a trial court's decision on a motion for summary judgment without deference, using the same standard as the trial court. Provost v. Fletcher Allen Health Care, Inc.,

6

2005 VT 115, ¶ 10, 179 Vt. 545, 890 A.2d 97.  Summary judgment is appropriate when, construing the facts as alleged by the nonmoving party and resolving reasonable doubts and inferences in favor of the nonmoving party, there are no genuine issues of material fact and judgment is appropriate as a matter of law.  V.R.C.P. 56.

¶ 15.    On appeal, plaintiffs advocate three theories of liability based on: (1) an implied private right of action created by the mandated-reporter statute; (2) a common-law duty of care created and shaped by the mandated-reporter statute; and (3) the duty defendant assumed when he undertook to investigate mother's allegations against Duby.  We address each argument in turn.

## I.  Private Right of Action Under 33 V.S.A. § 4913

¶ 16.    Plaintiffs argue that, pursuant to LaShay v. Department of Social & Rehabilitation Services, 160 Vt. 60, 625 A.2d 224 (1993), and the Restatement (Second) of Torts § 874A, Vermont's mandated-reporter statute, 33 V.S.A. § 4913, creates an implied private right of action for damages for children, their families, and their estates, who suffer injury due to a statutory mandated reporter's failure to report suspected abuse.[5]  We decline to address this question because

---

[5]    Section 874A of the Restatement (Second) of Torts (1965), which this Court has repeatedly relied on, see, e.g., Delmer v. State, 174 Vt. 157, 167, 811 A.2d 1214, 1224 (2002), explains that:

> When a legislative provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to an injured member of the class a right of action, using a suitable tort action or a new cause of action analogous to an existing tort action.

We do not decide whether, as plaintiffs argue, LaShay implicitly recognized a private right of action to enforce § 4913, nor whether, if it has not, we should recognize a private right of action. We note a split of authority from other jurisdictions that have examined this question.  Compare Becker v. Mayo Found., 737 N.W.2d 200, 208-09 (Minn. 2007) (concluding that mandated-reporter statute did not impliedly create private right of action), and Berry v. Watchtower Bible & Tract Soc'y of N.Y., Inc., 879 A.2d 1124, 1128 (N.H. 2005) (same), and Doe v. Marion, 645 S.E.2d 245, 249 (S.C. 2007) (same), with Ham v. Hosp. of Morristown, Inc., 917 F. Supp. 531, 537 (E.D. Tenn. 1995) (concluding that mandated-reporter statute impliedly created private right

7

we conclude that this record does not support a claim that defendant breached his duty under the statute.

¶ 17.   Defendant did not have reasonable cause to report mother's allegation that Duby had caused Dezirae's leg injuries because the allegation added nothing to the existing universe of allegations, and mother's recitation of the repetitious allegation alongside various other inconsistent claims was not sufficient to trigger a duty to report.

¶ 18.   Section 4913(a), as it existed in 2013, obliged defendant to make a report when he had "reasonable cause to believe that any child has been abused or neglected" within twenty-four hours of learning this information.  Pursuant to § 4914, as it existed in 2013, defendant would have needed to send the report to "[t]he Commissioner or designee," with defendant's and the child's personal contact information, "the nature and extent of the child's injuries," evidence of previous abuse or neglect of the child, and "any other information that the reporter believes might be helpful in establishing the cause of the injuries or reasons for the neglect as well as protecting the child and assisting the family."

¶ 19.   Under this framework, someone in defendant's position—an administrative reviewer examining DCF's substantiation of already-reported and investigated abuse—is not required to rereport the allegations that have already been reported and investigated.  If anything, he was required to make a new report, outside of the eventual substantiation decision, only upon learning of a cause or instance of abuse previously unreported to and uninvestigated by DCF.

¶ 20.   Here, in the course of his duties as an administrative reviewer, defendant interviewed mother, who provided—as she had during DCF's investigation—a litany of potential reasons for Dezirae's injuries.  This litany included an allegation against Duby, alongside various alternate and conflicting explanations.  This allegation substantially mirrors the allegation

---

of action), and Beggs v. State Dep't of Soc. & Health Servs., 247 P.3d 421, 425 (Wash. 2011) (same).

8

attributed to mother and previously documented in the DCF file that Duby had dropped Dezirae into her crib. The father of mother's other child and his wife each separately reported to DCF this allegation by mother. It was not a new allegation that the DCF investigator had not had the opportunity to investigate further.

¶ 21. Moreover, the context of mother's allegation against Duby did not give defendant reasonable cause to believe he had new information that DCF did not already have. The impact of mother's accusation against Duby was greatly diluted by her myriad, alternate explanations for Dezirae's injuries, as well as her admission to lying about the injuries to governmental authorities. In this context, as a matter of law, defendant did not have reasonable cause to make a report. We accordingly affirm the trial court's judgment against plaintiffs on their claim based on § 4913.

## II. Common-Law Negligence

¶ 22. Plaintiffs argue that, if § 4913 itself does not create a private right of action, the statute (1) creates a special relationship between defendant and Dezirae giving rise to a duty in a common-law-negligence claim, and (2) furnishes the standard of care under the doctrine of negligence per se.

¶ 23. This legal theory is distinct from plaintiffs' "private right of action" theory in that it relies on claims that § 4913 establishes a special relationship between defendant and Dezirae that gives rise to a common-law duty of care, and that § 4913 establishes the standard of care for fulfilling that common-law duty; it does not posit a private cause of action for damages directly on account of defendant's alleged failure to comply with the statute. However, because this argument, like the private-right-of-action argument, requires plaintiffs to show that defendant failed to comply with § 4913, we affirm the trial court's summary judgment for defendant on the same grounds relied upon above.

¶ 24. Where a party has an existing legal duty to another, a safety statute may serve as rebuttable evidence that the defendant breached the applicable standard of care, thereby shifting

9

the burden of production to the defendant.[6]  See Bacon v. Lascelles, 165 Vt. 214, 222, 678 A.2d 902, 907 (1996) (explaining that "proof of the violation of a safety statute creates a prima facie case of negligence" that "raises a rebuttable presumption of negligence and shifts the burden of production to the party against whom the presumption operates"); Larmay v. VanEtten, 129 Vt. 368, 371, 278 A.2d 736, 738-39 (1971) ("The rules of the road are safety statutes and proof of their violation, on the part of one charged with negligence, makes out a prima facie case of negligence against the offending operator.  But this presumption of negligence is, of course, open to rebuttal." (citation omitted)).  We have adopted the Restatement (Second) of Torts § 286 (1965), "which defines the elements of a safety statute or regulation" that may establish the standard of care. Dalmer v. State, 174 Vt. 157, 164, 811 A.2d 1214, 1222 (2002).  Under the Restatement, the statute or regulation must have been intended to protect the class of persons to which the plaintiff belongs against the particular hazard and harm that resulted.  Restatement (Second) of Torts § 286(a)-(d).

¶ 25.    Importantly, the safety statutes in the above line of authority do not themselves create a privately enforceable legal duty; they merely supply the standard of care in the face of an established common-law duty.  Where a plaintiff seeks to use a safety statute as the standard of care under the prima facie negligence rule, there must be an existing duty recognized by the common law.  As the New Hampshire Supreme Court has explained:

> The doctrine of [prima facie negligence] . . . plays no role in the creation of common law causes of action.  Thus, in many cases, the common law may fail to recognize liability for failure to perform affirmative duties that are imposed by statute.
>
>   Recognizing this distinction, we first inquire whether the plaintiff could maintain an action at common law.  Put another way, did the defendant owe a common law duty of care to the plaintiff?  If no common law duty exists, the plaintiff cannot maintain a negligence

---

    [6]  This "prima facie negligence" doctrine is different from the negligence per se rule, applied in many jurisdictions.  The negligence per se rule provides that a breach of a safety statute conclusively demonstrates that the defendant violated the standard of care.  See Marzec-Gerrior v. D.C.P. Indus., Inc., 164 Vt. 569, 575-76, 674 A.2d 1248, 1252 (1995) (Dooley, J., concurring) (explaining differences between prima facie negligence and negligence per se approaches).

10

action, even though the defendant has violated a statutory duty. If a common law duty does exist and there is an applicable statute, the defendant, in a negligence action, will be held to the statutory standard of conduct if the plaintiff is in a class the legislature intended to protect, and the harm is of a type the legislature intended to prevent.

Marquay v. Eno, 662 A.2d 272, 277 (N.H. 1995) (citations omitted).

¶ 26. Here, plaintiffs argue that defendant had a common-law duty to protect Dezirae because of his "special relationship" with her arising from defendant's status as a mandatory reporter under § 4913. See Restatement (Second) of Torts § 315 (1965) ("There is no duty so to control the conduct of a third person as to prevent [the person] from causing physical harm to another unless . . . (b) a special relation exists between the actor and the other which gives to the other a right to protection."). But even assuming they could establish a special relationship sufficient to create a common-law duty of care, plaintiffs' argument still rests on the claim that the standard of conduct required pursuant to that duty is defined by § 4913. That is, plaintiffs' own argument still requires plaintiffs to show defendant violated § 4913.

¶ 27. For the reasons set forth above, supra, ¶¶ 20-21, we conclude on this record that as a matter of law, defendant did not violate § 4913.

### III. Negligent Undertaking

¶ 28. Last, plaintiffs argue that defendant assumed a duty when he took it upon himself to meet with the DCF investigator to himself investigate whether it was Duby who had caused Dezirae's injuries. Having undertaken to investigate the cause of Dezirae's injuries, plaintiffs argue, defendant was liable for negligently failing to perform that investigation.

¶ 29. We disagree and conclude that, as a matter of law, defendant is not liable for negligent undertaking because there is no evidence demonstrating that he specifically engaged in an undertaking of the scope asserted by plaintiffs. Further, even if defendant had undertaken to

11

investigate Duby, his subjective intent and unilateral, uncommunicated actions do not support a negligent-undertaking claim.

¶ 30. This court has adopted § 324A of the Restatement (Second) of Torts, which "delineates when an undertaking to render services to another may result in liability to a third person." Derosia v. Liberty Mut. Ins., 155 Vt. 178, 182, 583 A.2d 881, 883 (1990). Section 324A of the Restatement (Second) of Torts provides that a person who undertakes, whether for free or compensation, to render services to another that the person should recognize as necessary for the protection of a third person, or the third person's property, is subject to liability to the third person for failure to exercise reasonable care in the undertaking if:

> (a) [the] failure to exercise reasonable care increases the risk of such harm, or

> (b) [the person] has undertaken to perform a duty owed by the other to the third person, or

> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

The § 324A subsections (a), (b), and (c) are disjunctive—the plaintiff need only meet one to survive summary judgment. Derosia, 155 Vt. at 188-89, 583 A.2d at 887.

¶ 31. Before considering these subsections, we "require[] a threshold showing that there existed an undertaking to render services for another for the protection of a third party." Kennery v. State, 2011 VT 121, ¶ 14, 191 Vt. 44, 38 A.3d 35. We have noted that "courts generally require very little action on the part of defendants to find an undertaking." Sabia v. State, 164 Vt. 293, 303, 669 A.2d 1189, 1194 (1995). But, for there to be an "undertaking" at all, the defendant must have undertaken to do the specific task he or she is accused of performing negligently, and the extent of the undertaking defines the scope of the liability. Murphy v. Sentry Ins., 2014 VT 25, ¶ 34, 196 Vt. 92, 95 A.3d 985; see also Dekens v. Underwriters Labs. Inc., 132 Cal. Rptr. 2d 699, 702 (Ct. App. 2003) ("The foundational requirement of the good Samaritan rule is that in order for

12

liability to be imposed upon the actor, [the actor] must specifically have undertaken to perform the task that [the actor] is charged with having performed negligently . . . ." (quotation omitted)); Fry v. Medicare-Glaser Corp., 605 N.E.2d 557, 560 (Ill. 1992) ("Under the voluntary undertaking theory of liability, the duty of care to be imposed upon a defendant is limited to the extent of its undertaking.")

¶ 32.    In the past, this Court has closely scrutinized the actual task assumed by the defendant in determining whether there was the threshold "undertaking."  In Lanford v. Vermont Department of Social & Rehabilitation Services, for instance, we examined a negligent-undertaking claim against the Department of Social and Rehabilitation Services (SRS) after a child died at a daycare following an annual SRS relicensing inspection.  167 Vt. 407, 708 A.2d 919 (1998).  We rejected this claim because SRS's undertaking was in a "regulatory enforcement role"; the "inspection [was] to enforce compliance with the law, not to render services to the day care center"; and while the "Department inspectors may offer guidance to a day-care provider on how to improve its facility," this did not prove "that the State ha[d] undertaken the provider's duty of care toward the children under its supervision."  Id. at 412, 708 A.2d at 921-22.

¶ 33.    Similarly, in Andrew v. State, we reviewed a negligent-undertaking claim brought by a private employee who had been injured on his employer's machine following a State inspection of the business premises pursuant to the Vermont Occupational Safety and Health Act (VOSHA), 21 V.S.A. §§ 201-264.  165 Vt. 252, 682 A.2d 1387 (1996).  We held that the § 324A "threshold requirement that there be an undertaking of services [was] not met" because, under the VOSHA statutory scheme, "the State is not undertaking a service for the employer or its employees, but rather is policing the employer's compliance with the law."  Id. at 260, 682 A.2d at 1392.  We explained, "VOSHA is intended to protect the public, but the statute is not intended to shift the burden of protecting workers and compensating them for their workplace injuries from the employers and their workers' compensation insurers to the State."  Id.; cf. Derosia, 155 Vt. at

186-87, 583 A.2d at 886 (holding that employer's workers'-compensation insurance carrier's undertaking to perform inspection of workplace premises supported negligent-undertaking claim).

¶ 34.    In this case, the evidence of an actual undertaking is insufficient as a matter of law. The record lacks any evidence that when defendant spoke to the DCF caseworker about Duby he specifically undertook to broadly investigate the cause of Dezirae's injuries rather than to fulfill his narrower contractual and statutory obligation as an administrative reviewer to decide whether to uphold DCF's substantiation of abuse against mother.  The absence of evidence that defendant attempted to perform the specific undertaking alleged by the plaintiffs is sufficient to support the trial court's summary judgment for defendant.

¶ 35.    Moreover, even if plaintiffs had proffered sufficient evidence to create a dispute of fact as to whether defendant undertook to investigate Duby, or the cause of Dezirae's injuries more broadly, plaintiffs' claim would still fail because defendant never communicated such a plan to DCF, Dezirae, or her family.  As noted above, it is not enough to simply perform an undertaking negligently.  To impose liability under § 324A subsections (a),(b), or (c), the defendant must have increased the risk of harm to the third person, undertaken to perform a duty owed by another to a third person, or caused harm to the third person based on the reliance of the other—here, DCF— or the third person—here, Dezirae—on the defendant's undertaking.  There does not need to be a contractual relationship between defendant and DCF to form an undertaking, or even necessarily an explicit promise. See Smyth v. Twin State Improvement Corp., 116 Vt. 569, 569, 80 A.2d 664, 665 (1951) ("Even a volunteer or a stranger is liable for an injury negligently inflicted on . . . another; the law imposes an obligation upon everyone who attempts to do anything for another, even gratuitously, to exercise some degree of care and skill in the performance of what [the person] has undertaken[.]"). But defendant privately conducting his own personal investigation, not communicated to anyone else, would not have increased the risk of harm to Dezirae relative to the risk she faced in the absence of his private investigation.  Nor is there any evidence that defendant

14

assumed DCF's statutory duty to investigate Dezirae's injuries.  And nobody—not Dezirae, not plaintiffs, not DCF—could have relied on defendant's uncommunicated undertaking to their detriment.  In order to increase the risk of harm, assume DCF's duty to investigate, or garner reliance—in other words, in order to meet § 324A(a)-(c)—defendant must have at least notified DCF, Dezirae, or her family, through his words or behavior, that he undertook to perform the investigation plaintiffs allege.  His subjective intentions and unilateral actions in a bubble are not enough.  There is no evidence of that communication here.

     <u>Affirmed</u>.

                FOR THE COURT:

                _____

                Associate Justice

15