NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 56

No. 2015-091

| | |
|---|---|
| Town of Milton Board of Health | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, |
| | Civil Division |
| | |
| Armand Brisson | December Term, 2015 |

Dennis R. Pearson, J.

Robert E. Fletcher and Eric G. Derry of Stitzel, Page & Fletcher, P.C., Burlington, for
  Plaintiff-Appellee.

Katherine E. McNamara, Ticonderoga, New York, for Defendant-Appellant.


PRESENT:  Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.


¶ 1.    **SKOGLUND, J.**   The Town of Milton successfully brought an action to enforce a town order requiring defendant Armand Brisson to remediate problems with his residence that constituted a public health hazard.  Defendant does not contest either the civil penalty or the compensatory costs for engineering fees assessed against him by the court, but contends that the court's award of attorney's fees was neither authorized under the applicable statute nor warranted under an equitable exception to the American Rule requiring each party to bear the cost of its own attorney's fees.  We agree and therefore vacate the attorney's fee award.

¶ 2.    The facts of this case are not in dispute.  Defendant was the owner of a two-story brick structure built around 1850 and located in the Town of Milton at the intersection of Main

Street and U.S. Route 7.[1]  He had lived in that building for most of his life.  At the time of the events in question, he was living on the second floor of the building and utilizing the large attic for storage, while renting the first floor for use as a small bar/restaurant.

¶ 3.    On May 6, 2012, the Milton Police Department notified the Town's deputy health officer that bricks were falling off the western exterior of the building onto the street and sidewalk below.  After confirming this and observing that a part of the western brick wall was bulging out, the health officer issued an emergency health order later that same day condemning the building and declaring it unfit for any use or occupancy.  See 18 V.S.A. § 127(a) ("A health officer may, without a prior hearing, issue an emergency health order when necessary to prevent, remove, or destroy an imminent and substantial public health hazard, or to mitigate an imminent and substantial significant public health risk.").  The order required defendant to hire a structural engineer within twenty-four hours to examine the building and recommend necessary repairs, and to complete those repairs within seven days.

¶ 4.    The next day, the person who served as the Town's zoning administrator, primary health officer, and secretary for the local health board visited the site with representatives from the Milton Police Department and the Vermont Agency of Transportation (AOT).  Over the next several days, additional bricks fell and the bulged area of the wall collapsed.  On May 11, AOT workers installed concrete "Jersey barriers" along the western side of the building adjoining Route 7 as a buffer zone.

¶ 5.    Because there was a bar/restaurant on the ground floor, the building was a public building subject to state codes.  As a result, the regional assistant fire marshal for the Vermont Department of Public Safety, along with the town health officer and defendant, inspected the building on May 11, only to learn that the bar/restaurant had recently ceased operations.  The fire marshal and health officer performed a visual inspection of the interior and exterior of the

_____

[1]  On April 27, 2016, while this appeal was pending, defendant's attorney notified this Court that defendant, who was in his seventies, had died.

2

building's first floor, but defendant did not permit access to his living quarters on the second floor and in the attic.

¶ 6.    Following the site visit, the state fire marshal issued an initial report prohibiting all public use or occupancy of the building.  Apart from confirming apparent structural defects in the supporting walls, the report noted signs of heavy rotting in the roof area and damage to the slate roof, as well as moisture damage in various interior areas.  The report recommended a structural evaluation and electrical inspection to be completed by May 18.

¶ 7.    On May 21, the town board held its required hearing on the May 6 emergency order.  See id. § 127(c) ("A person to whom an emergency health order is directed shall be given the opportunity for a hearing within five business days of the issuance of such order.").  Defendant appeared and acknowledged that he had taken no action in response to the May 6 order.  At the conclusion of the hearing, the town board issued an order finding that "[a] portion of the brick wall on the northwest corner of the building is collapsing into River St./US Route 7, a condition that endangers passing motorists and pedestrians."  The order further found the condition constituted "an immediate and substantial public health hazard due to the imminent danger of a collapse, the detrimental effect such a collapse would create on the structural integrity of the remaining building, and the building's close proximity to River Street/US Route 7, and Ice House Road."  The town board ordered that the building remain uninhabited until repaired to the satisfaction of the board, that defendant begin work to stabilize and repair the structure within twenty-four hours, and that the structure be demolished if defendant did not commence the repair work within twenty-four hours.

¶ 8.    Defendant appealed the May 21 order to the state board of health, which considers such appeals de novo.  Id. § 128 (providing that any person aggrieved by local health board order may appeal to state board of health, which shall consider matter de novo in contested case hearing).  On July 30, 2012, after a contested hearing, the state board affirmed the Town's order,

3

concluding there was a continuing risk of falling brick and further building collapse which posed a significant public health risk. Meanwhile, on June 7, 2012, the Town filed the instant action seeking to enforce the local board's May 21 order by way of a preliminary injunction. On June 21, following a hearing, the superior court issued a preliminary injunction ordering defendant to: (1) immediately remove loose brick on the west wall and install a temporary framework to support the brick above the area where the collapse occurred; (2) install a protective tarp over the west wall of the building pending completion of the repairs; (3) rebuild the missing portion of brick within sixty days; (4) install a protective tarp over the south wall due to the Town's concerns over some cracking and movement of brick there; and (5) contract with his engineer to provide guidance and oversight as to the building's repair.

¶ 9. On September 9, 2012, the Town filed a motion for contempt based on defendant's failure to comply with the preliminary injunction. A hearing on the motion was held on November 27, 2012. At the conclusion of the hearing, which defendant did not attend, the superior court issued an order finding him in civil contempt for a willful violation of the court's previous order. The court acknowledged that defendant had filled in new brick on the west side of the building where the collapse had occurred, but found that defendant had not yet done masonry work on the south wall of the building or hired a structural engineer. The court ordered as follows: (1) town representatives were authorized to enter the building on December 3, 2012 to conduct a structural inspection of the interior and exterior of the building; (2) defendant was required to remove rubble and scaffolds from the west side of the building within five days so that the Jersey barriers could be removed; and (3) the Town would be awarded attorney's fees, not to exceed $600, as a sanction incurred in the contempt motion.

¶ 10. Defendant sought reconsideration of the November 27 order, and following a hearing, the superior court issued a December 19, 2012 order continuing the contempt hearing to mid-January 2013. In the order, the court acknowledged the testimony of defendant's contractor,

4

who explained what repairs had been done and what work still needed to be done before the scaffolding and Jersey barriers could be removed. The court indicated that it would consider lifting the attorney's fee sanction if a December 27 site visit by the town health officer went well and there was a solid plan to repair the building's remaining problems.

¶ 11. On February 13, 2013, the superior court held a hearing on defendant's motion to reconsider its contempt order. Two days later, the court issued an entry order denying the motion for reconsideration, stating that the masonry repairs ordered on June 21, 2012 still had not been completed. The court ordered defendant, by July 1, 2013, to: (1) complete the masonry repairs on the west side of the building; (2) repair fascia and eaves showing signs of rot; and (3) repair the slate roof to prevent potential injury to passersby. The court deferred any final ruling on its request for attorney's fees, stating that if defendant completed the required work in a professional manner, "it is likely that he will be relieved of the obligation to pay the legal fees." The court stated, however, that "[i]f the work is not performed—or is performed in an inadequate manner—the court will require him to pay the legal fees as a sanction for the prior contempt." On March 19, 2013, the court granted the Town's motion to amend its February 15 order to require masonry repairs to the south side of the building as well as the west side.

¶ 12. Following a hearing on August 19, 2013, the court ordered that before October 15, 2013, "defendant shall complete repointing of the brick façade, soffit and fascia repair, and completion of the repair of the metal cap along the peak of the roof." The court set a status conference for mid-October 2013 to determine whether defendant had "completed repairs sufficient to meet the concerns raised by the Town under 18 V.S.A. § 130 of hazards to the public health."

¶ 13. By the time the status conference was held on October 21, a new judge had been assigned to the case. Following the status conference, the court noted several repairs that had

5

been done and several that still needed to be done, but concluded that the specific tasks that the August 19 order required of defendant had not been substantially completed.

¶ 14. In the spring of 2014, the superior court granted the Town's motion to conduct a more invasive structural assessment of the building. That assessment took place on June 4, 2014, and a detailed report was filed three weeks later. The report noted that the load-bearing capacity of the second floor was well below code requirements and that there was some damage to the slate roof. The report indicated that the brick work and fascia issues in both the south and west areas of the building had been adequately addressed and repaired, but nonetheless recommended that no public use or occupancy of the building be permitted until defendant addressed load-bearing issues concerning the second floor and attic, and a more thorough investigation of the roof was done.

¶ 15. A final hearing on the Town's motion for sanctions and penalties pursuant to 18 V.S.A. § 130 was held on July 31, 2014. On December 1, 2014, the court issued a decision and judgment prohibiting defendant from any and all public use of the building and assessing against defendant $22,256 that included a civil penalty of $1788 ($2 for each day defendant was clearly in violation of the Town's health order affirmed on July 30, 2012), $7886 as reimbursement for the Town's out-of-pocket engineering fees, and $12,582 in attorney's fees.

¶ 16. The court acknowledged the determination in its October 21, 2013 order that defendant had complied with the specific requirements of the August 19, 2013 order, but stated that "those items alone had never been the sole concern of the Town or the State with regard to over-all safety and risk of public injury because of the deteriorated condition of the Defendant's building." The court noted in particular load-bearing issues which could not have been resolved until the building was assessed by a structural engineer, which did not take place until the summer of 2014.

¶ 17. As related above, in addition to granting a permanent injunction as to public use or occupancy of the building and assessing civil penalties, the court awarded the Town $12,582 in attorney's fees. The court concluded that the fees were recoverable as a matter of right under 18 V.S.A. § 130(b)(5) and also as an equitable exception to the general rule that each party bear the cost of its own attorney's fees.

¶ 18. On appeal, defendant does not challenge the issuance of the permanent injunction or the assessment of the civil penalty, but argues that § 130(b)(5) does not authorize the award of attorney's fees, and that, to the extent the court relied upon the equitable exception to the American Rule requiring parties to bear the cost of their own attorney's fees, it abused its discretion in doing so.

¶ 19. Regarding the statutory issue, § 130 authorizes the state health commissioner or a local board of health to bring an action in superior court to enforce orders aimed at mitigating or removing a public health hazard or risk. 18 V.S.A. § 130(a). The section further authorizes the court to grant injunctive relief and to exercise all of the powers available to it, including enjoining future activities that may contribute to a public health hazard or risk, ordering remedial actions to mitigate the hazard or risk, ordering facilities designed to mitigate the hazard or risk, ordering compensation for any property destroyed or damaged, ordering reimbursement from persons who caused government expenditures, and levying civil penalties. Id. § 130(b). The provision at issue in this case is § 130(b)(5), which provides that the court may order "reimbursement from any person who caused government expenditures for the investigation and mitigation of the public health risk or the investigation, abatement, or removal of public health hazards." Id. § 130(b)(5).

¶ 20. The term "governmental expenditure" is not defined in the statute. Citing the broad dictionary definition of the word "expenditure"—the act or process of paying out—and the fact that its litigation expenses were directly related to its efforts to enforce the public health

order, the Town argues that the plain meaning of the term "governmental expenditures" in § 130(b)(5) encompasses its attorney's fees incurred in its enforcement action against defendant. We disagree.

¶ 21. "When interpreting a statute, our principal goal is to effectuate the intent of the Legislature." Vermont Golf Ass'n v. Dep't of Taxes, 2012 VT 68, ¶ 7, 192 Vt. 224, 57 A.3d 707 (quotation omitted). We look first to the statutory language to determine legislative intent, "but, if doubts exist, the real meaning and purpose of the Legislature is to be sought after and, if disclosed by a fair and reasonable construction, it is to be given effect." In re Carroll, 2007 VT 19, ¶ 9, 181 Vt. 383, 925 A.2d 990 (quotation omitted); see Paquette v. Paquette, 146 Vt. 83, 86, 499 A.2d 23, 26 (1985) (stating that if statutory language is ambiguous or doubts exist about its meaning, "the legislative intent should be gathered from a consideration of the whole and every part of the statute, the subject matter, the effects and consequences, and the reason and spirit of the law" (quotations omitted)). The proper construction of a statute "is a question of law subject to nondeferential and plenary review." Carroll, 2007 VT 19, ¶ 9.

¶ 22. As indicated, the provision at issue allows the court to order reimbursement from persons who caused governmental expenditures "for the investigation and mitigation of the public health risk or the investigation, abatement, or removal of public health hazards." 18 V.S.A. § 130(b)(5). Although this broad language could be construed to include attorney's fees as costs expended indirectly for the investigation of a public health hazard, it also could be construed more narrowly to mean only those costs directly incurred in the investigation, mitigation, abatement, or removal of public health risks or hazards—such as fees for engineers investigating the risk or hazard or for companies involved in mitigating or removing the risk or hazard. Indeed, this latter interpretation is the more likely legislative intent underlying the

8

statute, given that the provision does not refer to litigation costs and that attorney's fees are a unique type of expense that is subject to special rules and treatment.[2]

¶ 23. Generally, when the Legislature has intended to authorize the award of attorney's fees in a particular action—beyond that permitted under the common law—it has done so explicitly. See, e.g., 9 V.S.A. § 2458(b)(3)-(4) (authorizing court in consumer protection actions, among other things, to order reimbursement for state's "expenses in investigating and prosecuting the action" and to "offset the costs of providing legal services" from special funds); 9 V.S.A. § 4458(a)(3) (allowing tenants to recover "damages, costs, and reasonable attorney's fees" from landlords for failure to remedy habitability issues); 13 V.S.A. § 3701(f) (providing that persons who suffer damages as result of crime of unlawful mischief "may recover those damages together with reasonable attorney's fees in a civil action"); 21 V.S.A. § 678(a)-(b) (providing that commissioner of labor may allow claimants in workers' compensation actions "to recover reasonable attorney's fees when the claimant prevails," and that claimants in appeals to superior or supreme court "shall be entitled to reasonable attorney's fees as approved by the

---

[2] We note that the Legislature has employed the term "governmental expenditures" in several other statutes without defining it. See 6 V.S.A. § 4995(b)(6) (authorizing court in agricultural water quality action to order, among other things, reimbursement to state "from any person who caused governmental expenditures for the investigation, abatement, mitigation, or removal of a hazard to human health or the environment"); 10 V.S.A. § 1274(a)(7) (authorizing court in water pollution control action to order, among other things, "reimbursement to any agency of federal, state or local government from any person whose discharge caused governmental expenditures"); 10 V.S.A. § 1934(a)(6) (authorizing court in action involving liquid storage tanks to order, among other things, "reimbursement to any agency of federal, state or local government from any person whose acts caused governmental expenditures under section 1283 of this title, or under subdivision 1941(b)(3) or (7) of this title and in accordance with the provisions of subsection 1941(f) of this title"); 10 V.S.A. § 6610a(a)(2)(F), (c)(2)(F) (authorizing court in waste management action to order, among other things, "reimbursement to any agency of federal, state, or local government from any person whose act caused governmental expenditures under section 1283 of this title"); 10 V.S.A. § 8221(b)(5) (authorizing court in environmental civil enforcement action to order, among other things, "reimbursement from any person who caused governmental expenditures for the investigation, abatement, mitigation, or removal of a hazard to human health or the environment"). We do not propose to construe the meaning of the term "governmental expenditures" in these statutes, which are not before us and involve distinct purposes and policies, but we find nothing in the use of the term in those statutes to suggest that the term should be construed in 18 V.S.A. § 130(b) to include attorney's fees.

Court"); 32 V.S.A. § 5258 (providing that fees and costs following delinquent tax sale of real property include "expenses actually and reasonably incurred by the tax collector for legal assistance in the preparation for or conduct of said sale when authorized by the selectboard").

¶ 24. "Where the Legislature has demonstrated that it knows how to provide explicitly for the requested action, we are reluctant to imply such an action without legislative authority." Daniels v. Vt. Ctr. for Crime Victims Servs., 173 Vt. 521, 523, 790 A.2d 376, 379 (2001). This is particularly true when the implication would establish a statutory meaning that diverges from an established common law rule—in this case, the American Rule that each party bear the cost of its own attorney's fees. See Murphy v. Sentry Ins., 2014 VT 25, ¶ 52, 196 Vt. 92, 95 A.3d 985 ("[L]anguage of a statute or rule will not change common law by doubtful implication; it is only overturned by clear and unambiguous language." (quotation omitted)).

¶ 25. The Town argues, however, that in Town of Hinesburg v. Dunkling, 167 Vt. 514, 711 A.2d 1163 (1998), this Court upheld the award of attorney's fees to a municipality under former 24 V.S.A. § 4444(a), even though that statute that did not expressly permit the court to award attorney's fees. In upholding the award of attorney's fees in that case, we noted that the trial court based its assessed fine against the defendant on the town's attorney's fees and costs, and that the fine was within the amount permitted by statute. We concluded, therefore, that "determining the amount of the fine with regard to [the] Town's attorney's fees and costs was reasonable." Dunkling, 167 Vt. at 529, 711 A.2d at 1171; see City of St. Albans v. Hayford, 2008 VT 36, ¶ 18, 183 Vt. 596, 949 A.2d 1058 (mem.) (describing Dunkling as holding that trial court "acted within its broad discretion by basing its fine on the attorney's fees and other costs incurred by the town in bringing the enforcement action"). In other words, in Dunkling, rather than uphold an award of attorney's fees, we upheld a fine that was based on the town's litigation costs, including its attorney's fees. Hence, Dunkling adds no support to the Town's position here.

¶ 26. In Merlino v. Delaware County, 728 A.2d 949 (Pa. 1999), the Pennsylvania Supreme Court addressed an issue similar to the one presented in this case.[3] There, the question was whether citizens prevailing in an action under the state's storm management act could recover attorney's fees under a provision of the act allowing for an award of "the expense of such proceedings" against the violating party. Merlino, 728 A.2d at 950 (quotation omitted). The trial court determined that the broad dictionary definition of the word "expense" encompassed any expenditure incurred in a proceeding brought under the act, including attorney's fees. The supreme court agreed "as a matter of common parlance" that attorney's fees could be considered an expense under the statutory language, but noted that the American Rule disallowed attorney's fees "absent an express statutory authorization." Id. at 951. Thus, the court concluded that in the absence of such express statutory authorization, which the general assembly had made in other statutes, the word "expense" was an insufficient basis to award attorney's fees under the act. Id.

---

[3] The dissent criticizes the majority for "ignoring a far more relevant line of cases beginning with Key Tronic Corp. v. United States, 511 U.S. 809, 811 (1994)," while at the same time acknowledging that Key Tronic "offers partial support" for the majority's holding. Post, ¶ 46. In fact, as demonstrated by the dissent's own discussion of the case, Key Tronic fully supports our holding to the extent that it is relevant. In any event, both Key Tronic and the federal circuit cases that the dissent relies on are easily distinguishable because they construed a statute that expressly allows for the recovery of removal costs incurred through "enforcement activities" in response to an environmental threat, 42 U.S.C. §§ 9607(a)(4)(a), 9601(25), or the undertaking of necessary "legal" investigations, 42 U.S.C. § 9604(b). See United States v. Chapman, 146 F.3d 1166, 1174-75 (9th Cir. 1998) (allowing recovery of attorney's fees because of specific statutory language permitting recovery of costs related to "enforcement activities" and legal investigations); B.F. Goodrich v. Betkoski, 99 F.3d 505, 528 (2d Cir. 1996) (same). As the court stated in Chapman, "[t]he absence of a specific reference to attorney's fees is not dispositive if the statute otherwise evinces an intent to provide for such fees." 146 F.3d at 1175. The federal statute at issue in the cases cited by the dissent evinces such an intent through explicit statutory language allowing for the recovery of costs associated with legal investigations and enforcement actions. No such language is present in 18 V.S.A. § 130(b), however, and thus the absence of language allowing for recovery of attorney's fees is dispositive. In short, the cases cited by the dissent support our holding to the extent that they are relevant, and the Pennsylvania Supreme Court case cited above is directly on point and provides persuasive support for our position.

¶ 27. That conclusion rings even truer in the case before us, where the provision containing the term "governmental expenditures" allows reimbursement for the costs of investigating and mitigating public hazards without mentioning legal proceedings or litigation costs. Accordingly, we hold that § 130(b)(5) does not authorize the superior court to award attorney's fees as part of the reimbursement allowed therein.

¶ 28. The Town argues, however, that even if § 130(b)(5) does not authorize an award of attorney's fees, the superior court acted within its discretion in awarding the fees in the alternative based on an equitable exception to the American Rule. Again, we disagree.

¶ 29. As noted, Vermont follows the "American Rule," under which each party bears the cost of its own attorney's fees absent a statutory or contractual provision authorizing an award of attorney's fees. See Southwick v. City of Rutland, 2011 VT 105, ¶ 5, 190 Vt. 324, 30 A.3d 1298. This Court, however, focusing on "the historic powers of equity courts to award attorney's fees as the needs of justice dictate," has recognized a flexible exception to the American Rule. See In re Gadhue, 149 Vt. 322, 327, 544 A.2d 1151, 1154 (1987). In Gadhue, we expanded this exception from situations where the wrongful act of one person caused another person to incur litigation expenses in legal proceedings involving a third person, see Albright v. Fish, 138 Vt. 585, 591, 422 A.2d 250, 254 (1980), to situations where the bad faith action of one person caused another person to incur litigation expenses in unnecessary judicial proceedings with the wrongful actor. 149 Vt. at 328-29, 544 A.2d at 1154-55.

¶ 30. We concluded in Gadhue that an award of attorney's fees to the plaintiff was appropriate in that case as an exception to the American Rule where the defendant had built an unpermitted structure before plaintiff prevailed in an initial round of litigation challenging the structure, thereby requiring the plaintiff to engage in a second round of litigation to have the structure removed. Id. at 329, 544 A.2d at 1155; see Vt. Women's Health Ctr. v. Operation Rescue, 159 Vt. 141, 150-51, 617 A.2d 411, 417 (1992) (stating that Gadhue "fell within an

12

exception to the 'American Rule' applicable where an individual is forced to enter a second round of litigation to secure a clearly defined right that should have been granted without judicial intervention"). We stated, however, that "there is no suggestion that plaintiff would be entitled to litigation expenses incurred during her initial appeal," and that "the exception to the American Rule takes form during the second round of litigation in this case." Gadue, 149 Vt. at 329, 544 A.2d at 1155. We also cautioned, on multiple occasions in the opinion, that the equitable exception was appropriate " 'only in <u>exceptional cases and for dominating reasons of justice</u>.' " <u>Id</u>. at 328, 330, 544 A.2d at 1154, 1156 (quoting <u>Sprague v. Ticonic Nat'l Bank</u>, 307 U.S. 161, 167 (1939)) (emphasis in <u>Gadhue</u>). Further, we emphasized that the exception is triggered only by conduct that could be described as in bad faith, vexatious, wanton, oppressive, or unreasonably obstinate. <u>Id</u>. at 329, 544 A.2d at 1155; see also <u>Agency of Nat. Res v. Lyndonville Sav. Bank & Trust Co.</u>, 174 Vt. 498, 501, 811 A.2d 1232, 1236 (2002) (stating "that courts have inherent power, independent of Rule 11, to award attorney's fees in exceptional cases based on the bad-faith conduct of litigants").

¶ 31. We recognize that "[i]n general, awards for attorney's fees are reviewed for an abuse of discretion," but, on the other hand, "[o]ur standard for departing from [the American Rule] is demanding." <u>Knappmiller v. Bove</u>, 2012 VT 38, ¶ 4, 191 Vt. 629, 48 A.3d 607 (mem.). As we stated in <u>Lyndonville</u>, the equitable power to award attorney's fees as an exception to the American Rule "must be exercised with cautious restraint . . . only in those exceptional cases where justice demands an award of attorney's fees." 174 Vt. at 501, 811 A.2d at 1236.

¶ 32. With all due respect to the superior court's discretion, this is not a case where the interests of justice demanded an award of attorney's fees. Without discussion, the superior court stated that, in the alternative, the Town could recover its attorney's fees under the equitable exception to the American Rule. The court made no finding of bad faith or of vexatious or wanton conduct on the part of defendant. The record, including statements in the transcripts of

the hearings and in several of the earlier superior court decisions, reveals that that defendant had limited means and attempted to comply with the Town's health order, after it was upheld in July 2012 by the state board of health, within the confines of those limited means. The original health order noted only the collapsing brick wall on the west side of the building adjoining U.S. Route 7 as the condition causing a risk to the public. Within five days of the May 6, 2012 emergency order, the state addressed the immediate danger to the public by setting up the Jersey barriers. As indicated above, the court in its November 2012, December 2012, February 2013, and August 2013 orders noted progress made by defendant with respect to the ever-expanding demands of the Town. In its October 21, 2013 order, the court stated that its August 19, 2013 order had been substantially complied with, although further investigation by the Town resulted in more required repairs to the roof and load-bearing capacity of the building, which had not been addressed in the original health order.

¶ 33. Given our deference to the superior court's discretion with respect to attorney's fees, this is a close call. But our review of the record, including the superior court's findings, does not reveal the type of bad-faith conduct that makes this an exceptional case in which the interests of justice supports a divergence from the American Rule as to attorney's fees.

The superior court's December 1, 2014 decision and judgment are affirmed in all respects, except that the court's award of attorney's fees is vacated.

FOR THE COURT:

_____
Associate Justice

¶ 34. **DOOLEY, J., dissenting.** The Legislature granted local boards of health the authority to bring a civil action to enforce orders related to public health hazards or risks to public health. When such an action is brought, the superior court is empowered to "exercise all the powers available to it." 18 V.S.A. § 130(b). This includes "ordering reimbursement from

14

any person who caused governmental expenditures for the investigation and mitigation of the public health risk or the investigation, abatement, or removal of public health hazards." Id. § 130(b)(5). Despite this clear directive, the majority concludes that the court cannot exercise the power of granting attorney's fees because the Legislature's failure to use the particular words "attorney's fees" exempts this particular governmental expenditure from the general statutory authorization. This conclusion is made despite the statute's stated remedial purpose and in the face of the plain meaning of the statutory language. It relies upon one supportive decision from Pennsylvania while ignoring the multiple contrary decisions.

¶ 35. Because attorney's fees plainly fall within the statutory language allowing recovery of expenditures incurred in the enforcement of public health orders and because an award of such fees is in keeping with the statute's overall remedial purpose, I would hold that the statute allows recovery of the attorney's fees requested in this case, and affirm. I dissent from the majority's holding to the contrary.

¶ 36. In construing a statute, the plain meaning of the words used is the primary indication of the Legislature's intent. Tarrant v. Dep't of Taxes, 169 Vt. 189, 197, 733 A.2d 733, 739 (1999). "[W]here legislative intent can be ascertained on its face, the statute must be enforced according to its terms without resorting to statutory construction." Harris v. Sherman, 167 Vt. 613, 614, 708 A.2d 1348, 1349 (1998) (mem.).

¶ 37. The language at issue here is not simply the reference to "governmental expenditures," as emphasized by the majority, but the entire phrase, including the delegation of authority to the court and the list of actions for which reimbursement is allowed. When all of this language is considered, the logical conclusion is that the Legislature intended to allow recovery of the attorney's fees granted in this case. See Springfield Term. Ry. Co. v. Agency of Transp., 174 Vt. 341, 347, 816 A.2d 448, 453 (2002) (explaining that where language of statute "is dispositive" court will not interpret words in more limited sense).

15

¶ 38. First, the statute indicates that once an enforcement action is filed, the court is authorized to "exercise <u>all</u> the powers available to it." 18 V.S.A. § 130(b) (emphasis added). This is not limiting language. It authorizes the court to provide a full measure of relief to the board of health. See <u>In re Jones</u>, 2009 VT 113, ¶ 7, 187 Vt. 1, 989 A.2d 482 (explaining that this Court presumes plain language is "most basic expression of legislative intent").

¶ 39. Second, the statute states that the board of health can seek "reimbursement from any person who caused governmental expenditures." 18 V.S.A. § 130(b)(5). Use of the terms "reimbursement" and "governmental expenditures" indicate that the Legislature intended the local board to be repaid for all of the costs it incurred.

¶ 40. Third, the actions for which reimbursement is available are "the investigation and mitigation of the public health risk or the investigation, abatement, or removal of public health hazards." <u>Id</u>. These actions imply that the government entity can recover expenses incurred for nonlitigation and litigation responses, both of which may involve the work of attorneys. Investigation entails the assessment of a risk, the actions necessary to eliminate the risk, and the options available under the law to require the risk to be eliminated. Abatement usually refers to curbing or eliminating the risk or the harm. This often involves enforcement of the law through legal proceedings. Further, the term "removal" as used in environmental law refers to a short-term action taken to halt immediate risk posed by hazardous waste, such as through legal action. See 10 V.S.A. § 1283(g)(5) (defining "removal action" as "the cleanup or removal of released hazardous materials from the environment and such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment which may result from the improper release or threat of release of hazardous materials"); see also 42 U.S.C. § 9601(23) (defining removal as "the cleanup or removal of released hazardous substances from the environment"). These actions all involve the work of attorneys, either through nonligitation tasks, such as investigation and monitoring, or through litigation.

16

Although the words "attorney's fees" are not used, the language, when taken together, is sufficient to demonstrate that the Legislature intended for reimbursement of attorney's fees. See Martin v. City of Tigard, 72 P.3d 619, 627-28 (Or. 2003) (holding that plain language of constitutional provision, allowing assessment for "actual costs incurred by the government unit in designing, constructing and financing the project," meant city could include attorney's fees associated with litigation costs incurred in assessment and in condemnation proceeding).

¶ 41. The majority finds instructive a comparison of the coverage for the expenses of the engineer, as allowed by the trial court, and the noncoverage of the costs of a lawyer, calling the costs of the engineer direct expenditures and the costs of the lawyer only indirect expenditures. For two main reasons, I also find the comparison instructive, but I conclude the comparison supports coverage of lawyer expenses.

¶ 42. The first main reason is that the comparison is based on a distinction without a difference. Neither engineers nor lawyers are likely to be on the staff of a municipality, except possibly in the largest cities; each must be retained to respond to the emergency. In circumstances like those in this case, neither is hired to eliminate the public health hazard. Each is hired to enable the town to determine what must be done to eliminate the hazard and to require the building owner to take the necessary actions. Each is involved in the town investigation, mitigation, and abatement of the hazard. Each is involved in the litigation, and pre-litigation, aspects of the town's intervention. If the engineer's involvement is "direct," the lawyer's involvement is equally direct. There is no ascertainable reason why the Legislature would authorize reimbursement for the expense of the engineer, but not the lawyer. Particularly difficult to understand is why the Legislature would prohibit a town from being reimbursed for investigation and monitoring—that is, nonlitigation costs—because the tasks were performed by a lawyer. The majority's no-reimbursement decision fails to recognize this distinction and covers all lawyer fees whether for litigation or not.

17

¶ 43.    The second main reason is equally important.  The majority cites five statutes for the proposition that if the Legislature intended to authorize reimbursement for attorney's fees, it would have stated so explicitly.  In four of the examples, however, the Legislature has specifically authorized attorney's fees as the only litigation expenses recoverable beyond basic costs.[4]  See 9 V.S.A. § 4458(a); 13 V.S.A. § 3701(f); 21 V.S.A. § 678(a)-(b); 32 V.S.A. § 5258. In these situations, the plaintiff could not cover the cost of an engineer's fees to provide needed information in an investigation or to provide expert witness testimony.  Thus, the use of the exact language "attorney's fees" was necessary to provide the description of exactly what was authorized and not the appropriate language where attorney's fees are only part of authorized litigation and preparation costs.

¶ 44.    In contrast, the example for this latter situation—where attorney's fees are only part of authorized litigation and preparation costs—is the first statute cited by the majority, 9 V.S.A. § 2458(b)(3), which allows the Attorney General in a consumer protection action to obtain "an order requiring reimbursement to the State of Vermont for the reasonable value of its services and its expenses in investigating and prosecuting the action."  This language would cover both the cost of attorneys and the expense of obtaining expert assistance from persons like an engineer, but does not explicitly itemize the attorney's fees part of that recovery.

¶ 45.    There is no support in any of these statutes for the majority's position that the Legislature's failure to explicitly use the words "attorney's fees" in 18 V.S.A. § 130 means that it intended that attorney's fees not be recoverable.  This is not a situation where the Legislature sought to authorize only attorney's fees.  Rather than itemizing every type of expense the town could incur as a result of an enforcement action under § 130, the Legislature used a more general

---

[4]  Costs are defined in 32 V.S.A. § 1471(a) as entry fees, service fees, and witness fees. Witness fees are statutory, id. § 1551, and do not include compensation for the services of the witness.

description of the tasks for which a government entitle could be reimbursed without itemizing the professionals who might perform those tasks.

¶ 46.   The majority has cited a Pennsylvania case to support its position while ignoring a far more relevant line of cases beginning with Key Tronic Corp. v. United States, 511 U.S. 809, 811 (1994), even though this case offers partial support for its decision.  The issue in Key Tronic was whether a company which had been found liable for causing pollution of a site that in turn polluted a public water supply, and which had incurred "response costs" to clean up the site, could recover attorney's fees as part of those response costs from another entity responsible for the pollution.  The litigation arose under § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B), of the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986.  That section allowed recovery of "any . . . necessary costs of response incurred by any other person consistent with the national contingency plan."  Id.  The definition section of the Act defined "respond" or "response" to mean "remove, removal, remedy and remediation action" and specified that the terms "include enforcement activities related thereto."  42 U.S.C. § 9601(25).  Plaintiffs argued that attorney's fees in three areas fell within the statutory language as "necessary costs of response": (1) identifying other responsible parties; (2) negotiating liability and response with the Environmental Protection Agency (EPA); and (3) litigation to establish liability and contribution amounts for other responsible entities.

¶ 47.   The Court first stated the general rule governing statutory authority for recovery of attorney's fees:

> Our cases establish that attorney's fees generally are not a recoverable cost of litigation "absent explicit congressional authorization."  Recognition of the availability of attorney's fees therefore requires a determination that "Congress intended to set aside this longstanding American rule of law."  Neither CERCLA § 107, the liabilities and defenses provision, nor § 113, which authorizes contribution claims, expressly mentions the recovery of attorney's fees.  The absence of specific reference to attorney's

19

fees is not dispositive if the statute otherwise evinces an intent to provide for such fees. The Eighth Circuit, for example, found "a sufficient degree of explicitness" in CERCLA's references to "necessary costs of response" and "enforcement activities" to warrant the award of attorney's fees and expenses. Mere "generalized commands," however, will not suffice to authorize such fees.

Key Tronic, 511 U.S. at 814-15 (citations and footnote omitted). Applying that general standard, the Court denied attorney's fees for the second and third category of activities as not explicitly authorized by the statute, but allowed attorney's fees for the first activity.

¶ 48. The Court held that the statutory language did not authorize recovery of attorney's fees for the litigation-related activities—the second and third categories listed above—for three reasons. First, it held that the private right of action, although judicially recognized, was only implied in the statute, and it would be too great a stretch to include attorney's fees in the implied remedy. Id. at 818. Second, it noted that the same statutory amendments that brought the definitions on which plaintiff relied brought into CERCLA two instances where attorney's fees were explicitly authorized by name, suggesting they were not authorized by the more general language on which plaintiff relied. Id. at 818-19. Finally, it held that "it would stretch the plain terms of the phrase 'enforcement activities' too far to construe it as encompassing the kind of private cost recovery action at issue in this case." Id. at 819.

¶ 49. The Court held that attorney's fees for the first category of activities— determining other responsible parties—were recoverable under the act. It reasoned:

> On the contrary, some lawyers' work that is closely tied to the actual cleanup may constitute a necessary cost of response in and of itself under the terms of § 107(a)(4)(B). The component of Key Tronic's claim that covers the work performed in identifying other PRP's falls in this category. Unlike the litigation services . . . , these efforts might well be performed by engineers, chemists, private investigators, or other professionals who are not lawyers.

Id. at 820.

¶ 50. While Key Tronic determined the availability of attorney's fees for private plaintiffs, it did not address the situation where a government agency incurs remediation

20

expenses and seeks those, including attorney's fees, from a responsible party. The leading case addressing this question is United States v. Chapman, 146 F.3d 1166 (9th Cir. 1998). The court in Chapman stressed that the decision in Key Tronic had reserved the question of whether the government could recoup lawyer's fees spent in litigation and that the absence of a specific authorization for attorney's fees in the statute was not determinative under Key Tronic. Chapman, 146 F.3d at 1174-75. The court also relied on the fact that the authorization for the government's right of action was explicit under 42 U.S.C. § 9607(a)(4)(A), rather than implied for private plaintiffs by § 9607(a)(4)(B), and was broad covering "all costs of removal or remediation." Id. at 1175. Finally, it relied on the policy that the government should be able to recoup its expenses:

> Finally, there are persuasive policy arguments in favor of awarding the government its attorney fees. CERCLA is remedial legislation that should be construed liberally to carry out its purpose. Congress intended to facilitate the prompt cleanup of hazardous waste sites by placing the ultimate financial responsibility for cleanup on those responsible for hazardous wastes.
>
> In this case, Chapman was given the opportunity to clean up his property without EPA involvement. When Chapman failed to act, the EPA stepped in and Chapman finally cleaned up the site. By the time the cleanup was complete, the EPA had incurred approximately $34,000 in response costs. It demanded payment of these costs from Chapman. Chapman refused to pay, and as a result the EPA was forced to take legal action to recover its costs.
>
> The award of attorney fees to the government in this case can act as a powerful deterrent to other parties responsible for the cleanup of hazardous materials. The threat of attorney fees should encourage other parties in Chapman's position to take remedial action on their own when requested by the government. Who knows, it might even encourage responsible parties not to pollute and contaminate property in the first place.

Id. at 1175-76 (quotations omitted). Based on the general authority given to the governmental plaintiff and the policy considerations, the court in Chapman held that the government was entitled to recoup its expenditures on lawyers even in connection with litigation. Id. at 1176.

Other federal courts have followed <u>Chapman</u>. See <u>United States v. Dico, Inc.</u>, 266 F.3d 864, 877 (8th Cir. 2001); <u>B.F. Goodrich v. Betkoski</u>, 99 F.3d 505, 528 (2d Cir. 1996).

¶ 51. To the extent we look to persuasive authority to decide this case, we should follow <u>Chapman</u> and <u>Key Tronic</u>. The purpose of the statute in this case is to protect the public from health hazards, prevent the creation of public health hazards, and mitigate any risks. See 1985, No. 267 (Adj. Sess.), § 1 (explaining that public health act serves to protect public from public health hazards, prevent creation of public health hazards, and mitigate risks). The statute is serving the same purpose as CERCLA to protect the public by requiring the person who has caused the public health hazard to pay the full cost of its remediation. The authority of the Town here is as broad as that of the government in <u>Chapman</u>. Following <u>Chapman</u> would mean that we would affirm in this case. Even following the narrower holding in <u>Key Tronic</u>, applicable to a private plaintiff, would require us to affirm in part.

¶ 52. The majority asserts that <u>Chapman</u> is distinguishable because it contends that § 130(b) does not have the type of specific authorization contained in the federal law, which the majority describes as allowing "for the recovery of removal costs incurred through 'enforcement activities' in response to an environmental threat." <u>Ante</u>, ¶ 26 n.2. In fact, the statutes have several key similarities. The court in <u>Chapman</u> was persuaded by three particular aspects of the statute: first, the statute indicated the person causing the pollution was liable to the government for "<u>all</u> costs of removal or remedial action," 42 U.S.C. § 9607(a)(4)(A) (emphasis added); second, the statute allowed the government to undertake various tasks like "planning, legal, fiscal, economic, engineering, architectural, and other studies or investigations" and to recover the costs of those activities, <u>id</u>. § 9604(b)(1); and third, response or removal action was defined to include "enforcement activities," <u>id</u>. § 9601(25). Section 130(b) uses similarly broad language. It employs the same types of verbs to describe the actions for which the government should be reimbursed, including removal activities. Although there is no definition section to

accompany § 130 and therefore to further define the terms "investigation and mitigation" or "investigation, abatement, or removal," the statute uses these terms similarly to the federal statute. Further the section itself is entitled "Civil enforcement," plainly indicating that the Legislature was using these verbs in the context of an enforcement action.

¶ 53. As a final point, the majority notes the term "governmental expenditures" is used in several other statutes and "nothing in the use of the term in those statutes" suggests that it includes attorney's fees. Ante, ¶ 22, n.1. The majority does not further explain why this is true. None of these statutory provisions have been particularly construed by this Court, and in fact, in a prior case, this Court specifically reserved the question of whether attorney's fees were recoverable under a different section of the Waste Management Act. See Windsor Sch. Dist. v. State, 2008 VT 27, ¶ 17, 183 Vt. 452, 956 A.2d 528 (reserving question of whether attorney's fees are recoverable under 10 V.S.A. § 6615(i)). Although the majority states that it is not construing those statutes, the plain implication is that attorney's fees are unavailable in all these situations. Such an implication should be avoided, particularly where many of these statutes have remedial purposes intended to protect the public health and environment.

¶ 54. My last major difference with the majority is with its decision to reverse the award of attorney's fees without a remand. In essence the majority is ruling that any fee for work done by a lawyer, whether or not connected with litigation, cannot be recovered from a person responsible for the public health hazard while the fee for the work of any other professional, whether or not connected with litigation, can be recovered. The decision is directly contrary to the U.S. Supreme Court's decision in Key Tronic. It is also arbitrary without a supporting rationale.

¶ 55. The above is only the first major inappropriate result of the decision to reverse without a remand. As the majority decision recognizes, even where there is no statutory authority for the award of the costs of a lawyer's services, the trial court could have based its

civil penalty amount at least in part on reimbursing the Town for its litigation expenses. The court did not do so here because it covered those litigation expenses in the order to reimburse the Town for the fees paid to the lawyer and the engineer. In fact, attorney's fees represent the bulk of the court's financial award, and the civil penalty imposed, at two dollars per day, was far below the maximum of $10,000 per day authorized by 18 V.S.A. § 130(b)(6). The trial court should be given the opportunity to reconsider the amount of the civil penalty in light of the denial of attorney's fees.

¶ 56. For the foregoing reasons, I dissent.

¶ 57. I am authorized to state that Justice Eaton joins this dissent.

_____
Associate Justice