Filed 05/13/21

| VERMONT SUPERIOR COURT | | CIVIL DIVISION |
|---|---|---|



VERMONT SUPERIOR COURT
Washington Unit
65 State Street
Montpelier VT 05602
802-828-2091
www.vermontjudiciary.org

CIVIL DIVISION

Case No. 465-8-16 Wncv

| Duran vs. Mad River Medical Center et al |
|---|

## Opinion and Order on Defendants' Motion for Summary Judgment and Plaintiff's Motion to Compel

Ms. Patricia Duran[1] (age 63) was found dead in her condominium the day after she was treated for tooth pain by Defendant Deborah Van Dyke, a nurse practitioner at the Mad River Family Practice (MRFP), which is owned by Defendant Central Vermont Medical Center, Inc. (CVMC). Patricia's brother and the administrator of her estate, Plaintiff Michael Duran, brought this action against Ms. Van Dyke, CVMC, and Defendant Francis Cook, M.D., Ms. Van Dyke's collaborating physician, asserting several claims of medical malpractice and several other claims of or arising out of alleged misrepresentations to the effect that Ms. Van Dyke was a "doctor" rather than a "nurse." Defendants have filed a motion for summary judgment addressing the misrepresentation-related claims only.

Generally, Plaintiff alleges that Ms. Van Dyke, in treating Patricia for reported tooth pain, failed to recognize that Patricia, who has suffered her entire life from "salt-losing adrenal hyperplasia (21-hydroxylase deficient type)" also was

---

[1] Ms. Patricia Duran and Ms. Linda Duran are key figures in this decision. For ease of reference, the Court will refer to them by their first names and means no disrespect by using that approach.

1

experiencing adrenal insufficiency and urgently needed "stress doses" of steroids and immediate hospitalization. Ms. Van Dyke treated the tooth pain with a prescription for antibiotics and instruction to see a dentist and did not recognize or treat adrenal insufficiency. Plaintiff alleges that Ms. Van Dyke's failure to treat adrenal insufficiency was negligent and caused Patricia's death the following day. These are the basic allegations of the medical negligence claims not directly at issue at this time (Counts 1, 2, 3, 4, 12, and 13).

Plaintiff separately alleges that Patricia would have "solely" consented to treatment with a "doctor," as opposed to a nurse practitioner; she actually sought treatment with a doctor; and due to several misrepresentations to the effect that Ms. Van Dyke in fact was a doctor, Patricia in fact believed that she was seeing a doctor. Had she known the truth, Plaintiff alleges, she instead would have sought treatment elsewhere with a doctor. Plaintiff alleges that, had she been seen by a doctor, her adrenal insufficiency would have been properly recognized and treated, implying that the circumstances were such that a competent nurse practitioner would not reasonably have been capable of recognizing Patricia's adrenal insufficiency but a competent doctor would have.[2] These basic allegations of misrepresentation form the basis of those counts currently at issue: Count 5 (negligent misrepresentation); Count 6 (negligence per se); Count 7 (violation of the Consumer Protection Act (CPA), 9 V.S.A. §§ 2451–2481x); Count 8 (intentional

---

[2] This last step is "implied" to the extent that it is crucial to establishing causation but nowhere addressed in the evidence in the record. Because the parties do not address it in the context of Defendants' motion, neither will the court.

misrepresentation); Count 9 (breach of contract and the duty of good faith and fair dealing); Count 10 (violation of the federal Lanham Act, 15 U.S.C. § 1125(a)); Count 11 (*respondeat superior* of CVMC regarding misrepresentation); Count 14 (civil conspiracy to misrepresent); and Count 15 (punitive damages for misrepresentation). Defendants also seek summary judgment on Counts 2, 3, and 4 (medical malpractice) but only to the extent that those counts include misrepresentation framed as an item of medical malpractice.

I.    Summary Judgment Standard

Summary judgment is appropriate if the evidence in the record, referred to in the statements required by Vt. R. Civ. P. 56(c)(1), shows that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law. Vt. R. Civ. P. 56(a); *Gallipo v. City of Rutland*, 163 Vt. 83, 86 (1994) (summary judgment will be granted if, after adequate time for discovery, a party fails to make a showing sufficient to establish an essential element of the case on which the party will bear the burden of proof at trial). The Court derives the undisputed facts from the parties' statements of fact and the supporting documents. *Boulton v. CLD Consulting Engineers, Inc.*, 2003 VT 72, ¶ 29, 175 Vt. 413, 427. A party opposing summary judgment may not simply rely on allegations in the pleadings to establish a genuine issue of material fact. Instead, it must come forward with deposition excerpts, affidavits, or other evidence to establish such a dispute. *Murray v. White*, 155 Vt. 621, 628 (1991). Speculation is insufficient. *Palmer v. Furlan*, 2019 VT 42, ¶ 10, 210 Vt. 375, 380.

3

II.     Narrowing the Claims

As a preliminary matter, Plaintiff's negligence per se (Count 6) and Lanham Act (Count 10) claims may be dispensed with summarily, and Plaintiff's core medical malpractice claims can be limited.

For Count 6, Plaintiff cites several statutes and claims "negligence per se," evidently intending to assert liability based on the violation of "safety statutes." Defendants argued that there is no negligence per se in Vermont, prompting Plaintiff to recharacterize this claim as "prima facie negligence." There is no tort of prima facie negligence in Vermont, however. A legitimate safety statute provides *evidence* of a standard of care, the breach of which may give rise to a bursting bubble, rebuttable presumption of negligence. *See Sheldon v. Ruggiero*, 2018 VT 125, ¶ 24, 209 Vt. 33, 43 (Violation of safety statute "may serve as rebuttable evidence that the defendant breached the applicable standard of care, thereby shifting the burden of production to the defendant."); *see also Marzec-Gerrior v. D.C.P. Industries, Inc.*, 164 Vt. 569, 572–77 (1995) (Dooley, J., concurring) (criticizing bursting bubble presumption in safety statute context). Nonetheless, there must be an underlying duty to which that standard attaches. *Sheldon*, 2018 VT 125, ¶¶ 24–25, 209 Vt. at 43–44. In other words, the prima facie negligence rule is not its own independent claim. To the extent that Plaintiff intended Count 6 to assert a claim of negligence predicated on misrepresentation, he already has done

4

so exhaustively with his other misrepresentation claims.  Count 6 is duplicative at most and may be dismissed without any prejudice to Plaintiff.[3]

Plaintiff has assented to dismissal of Count 10 (violation of the Lanham Act).

Plaintiff's three core medical malpractice claims, Counts 2, 3, and 4, address both the alleged misdiagnosis and the alleged misrepresentation.  The parties spar as to whether a misrepresentation can ever be properly characterized as medical malpractice, but it is unnecessary to resolve that matter.  Even if a misrepresentation as to a provider's credentials can be characterized as medical malpractice, doing so in this case is entirely duplicative of Plaintiff's negligent and intentional misrepresentation claims and thus need not be separately considered.

III.    Detrimental Reliance

Reliance is an element of each of Plaintiff's core misrepresentation claims: negligent misrepresentation (Count 5), consumer fraud (Count 7), intentional misrepresentation (Count 8), and civil conspiracy to misrepresent (Count 14).  *See Union Bank v. Jones*, 138 Vt. 115, 121 (1980) ("An action for fraud and deceit will lie upon an intentional misrepresentation of existing fact, affecting the essence of the transaction, so long as the misrepresentation was false when made and known to be false by the maker, was not open to the defrauded party's knowledge, and was

---

[3] Plaintiff cites as safety statutes the CPA, the Lanham Act, and 26 V.S.A. §§ 129a, 1314.  Assuming that his point is that health care providers should not misrepresent their licensing or other professional credentials, it is not fully clear what he intends to achieve by proving that any such misrepresentation violates those statutes.  Defendants, at least so far, have not taken the position that any of them ever have had any right to advertise a nurse practitioner as a medical doctor.

relied on by the defrauded party to his damage."); *Silva v. Stevens*, 156 Vt. 94, 108 (1991) ("The tort of negligent misrepresentation requires that the plaintiff show 'justifiable reliance upon the information' provided by the alleged tortfeasor."). The details of Plaintiff's civil conspiracy claim are not fully clear, but Plaintiff concedes that there is an "underlying tort requirement" and asserts that the underlying tort in this case is "fraud" (*i.e.,* intentional misrepresentation). Plaintiff's Opposition to Summary Judgment at 32 (filed July 22, 2020). As noted, intentional misrepresentation requires reliance. Counts 11 and 15 address CVMC's *respondeat superior* liability for misrepresentation and punitive damages based on misrepresentation; both are contingent on liability for the underlying misrepresentation claims. Plaintiff does not argue that any of these claims *do not* require reliance.

The only one of these claims that Plaintiff argues does not necessarily require proof of reliance is his CPA claim. The CPA authorizes a private right of action at 9 V.S.A. § 2461(b), "which requires a 'consumer' to show either (1) reliance on a deceptive act in contracting for goods or services or (2) damages or injury from an unfair or deceptive act." *Dernier v. Mortgage Network, Inc.*, 2013 VT 96, ¶ 56, 195 Vt. 113, 136.

Plaintiff's CPA claim here, however, is unequivocally premised on a deceptive act inducing consumer behavior: alleged misrepresentations as to Ms. Van Dyke's professional credentials causing Patricia to seek treatment with her. This claim clearly requires reliance on any such misrepresentations. Moreover, while reliance

6

is not necessary to all formulations of CPA claims, *all* private damages claims under the CPA require proof of causation. "In a damage action under [the CPA], the consumer must demonstrate that he sustained 'damages or injury *as a result of* any false or fraudulent representations or practices' of the 'seller, solicitor or other violator.' Although we read broadly the requirement that there be injury, there must be some cognizable injury *caused by* the alleged consumer fraud." *Greene v. Stevens Gas Serv.*, 2004 VT 67, ¶ 13, 177 Vt. 90, 96 (citations omitted, emphasis added). In a case such as this, there can be no causation without reliance on the alleged misrepresentations. Plaintiff's CPA claim, thus, necessarily requires proof of reliance as well.

IV.    The Undisputed Facts Material to Reliance

The Court examines the summary judgment record based on the admissible evidence submitted by the parties. In this instance, the material facts exist almost exclusively in the testimony of a few witnesses, the text of a webpage, and a prescription bottle label. Any disagreement of the parties as to the facts exists largely in the inferences they urge the Court to draw from the underlying evidence. Of course, in "examining the record, 'the nonmoving party receives the benefit of all *reasonable* doubts and inferences.'" *Gauthier v. Keurig Green Mt., Inc.*, 2015 VT 108, ¶ 14, 200 Vt. 125, 134 (emphasis added).

Patricia was seen by Ms. Van Dyke on August 5, 2014. Prior to that time, CVMC had a publicly accessible website with a webpage marketing MRFP. The webpage listed Ms. Van Dyke as a provider at MRFP, and accurately included her

7

professional credentials.  Elsewhere on the page appeared a patient testimonial stating within quotation marks, "Dr. Deborah Van Dyke is the best doctor I've ever had.  I feel very comfortable with her and she always helps me when I need it."  CVMC selected that testimonial and put it on the website for advertising purposes, retaining the misleading references to "Dr." and "doctor."  There is no record evidence, however, that Patricia ever had any awareness of this webpage, its contents generally, or this patient testimonial specifically.

CVMC also had another webpage marketing a different practice group (unrelated to this case) that also contained a patient testimonial incorrectly describing a nurse practitioner as a "Dr."  Again, CVMC purposely placed that testimonial on the website, retaining the misleading "Dr." reference.  There is no record evidence that Patricia ever had any awareness of this webpage, its contents generally, or this patient testimonial specifically.

According to the deposition testimony of Linda Duran, Patricia's sister-in-law, on the day before the appointment, Patricia called Linda and told her that she was not "feeling well and needed to go to the hospital."  Deposition of Linda Duran at 57.  Patricia "sounded pretty normal" and did not further describe what was wrong.  *Id*. at 58.  Because it did not seem urgent, Linda said, "Why don't I call Dr. Cook's office [MRFP] . . . and take you there first."  *Id*. at 59.  Patricia apparently agreed.  Linda then called MRFP to make an appointment but was told that Patricia would have to do that herself.  *Id*. at 60.  In Linda's call to MRFP, she recalls having said that Patricia "needed to see a doctor."  *Id*. at 62.

Linda drove to Patricia's home, called MRFP, and put Patricia on the phone. Once on the phone, Linda recalls that Patricia said that she did not feel well and needed to see a doctor. *Id*. at 65. There is no other evidence as to what Patricia said on that call. The appointment was scheduled for the next day.

Linda drove to pick up Patricia at her house the next day for the appointment. When they arrived at MRFP, Linda told the receptionist that Patricia was there. This testimony then describes what happened next.

> Q. Okay. Did they say anything to you?
> A. Have a seat; the doctor will be out soon. Something like that.
> Q. Do you recall that those were the actual words, "the doctor will be out soon"?
> A. I don't—I don't know the exact words.
> Q. When you have gone to that practice to see Dr. Cook, Dr. Cook never came out to greet you in the reception area, did he?
> A. No.
> Q. So one of the—one of the assistants comes out to get you and brings you back?
> A. Yeah.

*Id*. at 73–74. "Someone" came to get Patricia and take her to the examination room. *Id*. at 76. Linda remained in the waiting room until Patricia eventually returned with a prescription for an antibiotic. Linda did not ask Patricia which provider she saw. *Id*. at 78.

They drove to the pharmacy to fill the prescription. Then Linda drove Patricia back to her house and dropped her off. *Id*. at 84. Throughout all of this, Linda and Patricia never discussed Patricia's specific health concerns or which provider she saw. As to Linda's belief that Patricia wanted to see a doctor specifically—as opposed to a nurse practitioner—Linda testified as follows:

9

Q. Okay. Do you have any knowledge as to whether Patty believed that she was going to see a female doctor at Mad River Family Practice?
A. No.
Q. You don't know one way or the other, correct?
A. Correct. I just know that she wanted to see a doctor.
Q. And how do you know that? Like, see an actual doctor?
A. How do I know? Because when she called me, she told me that she wanted to see a doctor.
Q. She said she wanted to go to the hospital, right?
A. Oh, she said she wanted to go to the hospital, and I assumed doctor, I guess.
Q. Okay.
A. There you go.
Q. And that's the only time she actually referenced anything like that? She said, I want to go to the hospital, correct? She didn't actually say, I want to see a doctor?
A. I don't recall.

*Id*. at 104–05.

In her deposition testimony, Ms. Van Dyke says that, when she first went into the examination room to see Patricia, "I introduced myself as a nurse practitioner and who I was. And then I asked her what she was here for, what she was at the clinic for, and she said she was there for tooth pain." Deposition of Ms. Van Dyke at 160–61.

The label on the prescription bottle ultimately obtained from the pharmacy in fact describes the prescriber as "DR. DEBORAH VANDYKE."

The report from a State police investigation into Patricia's death includes this: "Mrs. Day [Patricia's friend] said that she spoke to [Patricia] again around 1830 hours. According to Mrs. Day, [Patricia] told her that she had been to the doctor and had been prescribed medication." There is no other evidence in the record as to Mrs. Day's recollection of what Patricia had told her.

10

V.     Analysis Regarding Evidence of Reliance

The evidence in the record is insufficient to support a finding by a reasonable jury to the effect that Patricia relied to her detriment (or at all) on any misrepresentation as to Ms. Van Dyke's professional credentials in determining whether to be treated by her.  The thrust of Plaintiff's argument is that Patricia had a dangerous, underlying condition, adrenal hyperplasia, due to which she would only consent to be treated by doctors rather than nurse practitioners.  Due to alleged misrepresentations, Patricia thought that Ms. Van Dyke was a doctor and sought treatment from her for that reason alone.  Because Ms. Van Dyke was a nurse practitioner rather than a doctor, Patricia was seen by a provider without the skill and training to properly diagnose her.[4]

At the outset, it bears remarking that Patricia was not a regular patient at MRFP; she went there at Linda's suggestion.  Patricia had a longtime provider in Boston who was familiar with her history of adrenal hyperplasia.  There is no evidence in the record whatsoever to the effect that Patricia: (1) had any idea that she was suffering from adrenal insufficiency leading up to her appointment with Ms. Van Dyke; (2) subjectively believed that her history of adrenal hyperplasia was a reason to only see doctors and never see nurse practitioners; (3) had any other subjective belief or preference to only see doctors and never see nurse practitioners; or (4) could not have consulted with her Boston doctor before or after her

---

[4] There is no evidence on this point; the parties have not addressed it.  *See supra* n.1 at 2.

11

appointment with Ms. Van Dyke if she had thought there was any reason to do so. Nor is there any evidence that (5) a reasonable person with adrenal hyperplasia would choose to only see doctors rather than nurse practitioners for all health complaints or health complaints about tooth pain in particular.

Similarly, there is no admissible evidence that Patricia was affirmatively told that Ms. Van Dyke was a doctor, no evidence to rebut Ms. Van Dyke's testimony that she informed her she was a nurse practitioner, no evidence as what Patricia may have believed in that regard, no evidence that she wanted to see a doctor to the exclusion of a nurse practitioner, and no evidence whatsoever that she relied on any incorrect belief concerning Ms. Van Dyke's credentialling when she obtained treatment from Ms. Van Dyke.

There is *some* evidence of misrepresentations in the record as to whether Ms. Van Dyke was a doctor or nurse practitioner. The misidentification of Ms. Van Dyke as a "Dr." on CVMC's website is undisputed, however, it is irrelevant to reliance because there is no evidence that Patricia was ever aware of it.

Likewise, the misidentification of a different nurse practitioner from a different practice group as a "Dr." is undisputed but irrelevant to reliance because there is no evidence that Patricia was ever aware of it and it related to a different practice group.

Linda corrected her testimony that Patricia called her and specifically told her that she wanted to see a *doctor*. She had said she needed to go to a hospital, and Linda merely assumed that by hospital she meant doctor.

Linda's testimony to the effect that the receptionist said that the "doctor will be out soon" was equivocal. She said that the receptionist said something like that and that she did not recall exactly. She also testified that when she had gone to MRFP to see a doctor, the doctor never came out to the reception area when it was time for the appointment; an assistant did. There was no evidence that Ms. Van Dyke came out to the reception area to get Patricia for her appointment.[5] There also was no evidence that Patricia believed that whoever came to get her for her appointment was a doctor, or that whatever the receptionist had said meant that Ms. Van Dyke was a doctor or caused Patricia to believe anything.

The label on the prescription bottle from the pharmacy clearly misidentified Ms. Van Dyke as a doctor, but there is no evidence that Patricia ever read that label or relied upon it in any way. Moreover, it only came into existence *after* the appointment and thus could not have induced Patricia to make the appointment.

Linda did testify that Patricia, on the phone to MRFP, said that she did not feel well and wanted to see a doctor. Patricia apparently was speaking to Patricia Ann Meyer, an MRFP receptionist at the time. *See* Deposition of Ms. Meyer at 82. Ms. Meyer had no recollection whatsoever of the conversation. *Id*. at 60, 95–96. Ms. Meyer did testify that 99% of people making appointments would request a specific provider by name, something Patricia apparently did not do. *Id*. at 40. She separately testified that, as a general matter, her personal preference was to refer

---

[5] In fact, a nurse (not a nurse practitioner), Ms. Catherine Jonas, testified that she retrieved Patricia from the reception area and prepped her for the visit with Ms. Van Dyke. Deposition of Ms. Jonas at 56.

to doctors formally by title and last name (e.g., Dr. Cook) and nurse practitioners informally by first name only (e.g., Deb). *Id.* at 43. There is no evidence, however, to the effect that Ms. Meyer might have received a request to see a doctor specifically and instead made the appointment with a nurse practitioner without clarifying. There simply is no evidence at all as to what Ms. Meyer said to Patricia when Patricia made the appointment, and no evidence as to what Patricia believed following the phone call and when she went into the examination room.

Mrs. Day's alleged statement in the police report to the effect that Patricia had said, after the fact, that she "had been to the doctor," is simply inadmissible. Plaintiff has offered no convincing exception to the hearsay rule that would allow its admission. In any event, even if admissible, it does nothing to establish reliance. There remains no evidence that Ms. Van Dyke's status as a credentialed nurse practitioner as opposed to a doctor had any meaning or impact on Patricia.

Further, the statement is extremely vague and it is wholly unclear as to whether Mrs. Day was reporting the words actually spoken by Patricia or merely Mrs. Day's own general understanding of the content of what had been communicated. Either way, it is unclear whether this usage of the word *doctor* might have been intended to formally mean physician or M.D. as opposed to a nurse practitioner, or might have been a less formal layperson's euphemistic reference to a health care provider generally, including a nurse practitioner. In common usage, expressions such as "doctor's appointment" do not necessarily refer to medical doctors exclusively.

14

This ambiguity between formal and informal usages of the word *doctor* by laypersons, unaccounted for in the evidentiary record, also calls into question what Patricia may have meant when she called MRFP and asked to see a doctor and what she may have believed after the appointment had been scheduled.

Ultimately, Plaintiff's argument that Patricia wanted to see a medical doctor exclusively, and not a nurse practitioner, actually believed that she was seeing a medical doctor rather than a nurse practitioner, and so believed in reliance on misrepresentations to the effect that Ms. Van Dyke was a medical doctor has virtually no evidentiary support and is wholly speculative. Such a trail of conjecture goes well beyond the realm of permissible inference and enters into pure speculation. Evidence that would leave the jury to speculate is insufficient for summary judgment purposes. *Bernasconi v. City of Barre*, 2019 VT 6, ¶ 11, 209 Vt. 419, 423.

Defendants are entitled to summary judgment on these misrepresentation-based claims, including Count 11 (seeking *respondeat superior* liability for misrepresentation claims) and Count 15 (seeking punitive damages for misrepresentation claims).[6]

VI.    Count 9 Contract Claim

Plaintiff's Count 9 reimagines the core misrepresentation tort as a breach of contract (or the corresponding duty of good faith and fair dealing). Defendants,

---

[6] To the extent Plaintiff intends Count 11 to extend to the surviving claims, it remains in the case to that extent only.

15

relying on *Fercenia v. Guiduli*, 2003 VT 50, 175 Vt. 541, argue that medical malpractice cannot be framed under the law of contract, although the more apt question here would be whether misrepresentation can be so termed. In *Fercenia*, the *trial court* had ruled that "plaintiff's breach of contract claim was improper because the suit '[a]s a medical malpractice claim . . . is a tort action.'" *Id.*, 2003 VT 50, ¶ 4, 175 Vt. at 57. That was not an issue on appeal, however, and the Supreme Court did not issue a ruling on that point. Similarly, here, it is unnecessary to address the broader question of whether medical negligence can *ever* be properly framed as a breach of contract. *See generally* 23 Williston on Contracts § 62:14 (4th ed.) (discussing nature of contractual relationship between physician and patient).

In this case, the issue is misrepresentation, and the law of contracts squarely accounts for misrepresentations. *See, e.g.*, Restatement (Second) of Contracts §§ 159–173. As clearly, however, Plaintiff is not seeking contract remedies, such as rescission or reformation, that might flow from misrepresentation inducing a contract. Plaintiff is hoping to obtain compensatory damages for personal injury—Patricia's death—plainly the province of tort law, thus revealing the true nature of this contract claim to be a tort claim. Plaintiff's tort claims are squarely presented in the other counts. This one is simply duplicative.

In any event, even if there were a valid way to frame Plaintiff's misrepresentation claim as a breach of contract or the duty of good faith and fair dealing, the facts of this case could not support it. Black letter contract law requires a meeting of the minds on the essential terms of a contract for it to be

16

enforceable.  "To constitute a meeting of the minds, the acceptance 'must in every respect meet and correspond with the offer, neither falling short of nor going beyond the terms proposed, but exactly meeting them at all points . . . and, in the absence of such an acceptance, subsequent words or acts of the parties cannot create a contract.'" *Sweet v. St. Pierre*, 2018 VT 122, ¶ 12, 209 Vt. 1, 7 (citation omitted). The evidence, described above at length, as a matter of law, could not reasonably support any finding that Patricia and any of Defendants ever arrived at a meeting of the minds to the effect that Patricia would be seen by a doctor rather than a nurse practitioner.  There is no enforceable contract as to that issue, which is the sole basis for breach claimed by Plaintiff.

VII.    Plaintiff's Rule 56(d) Request and Plaintiff's Motion to Compel

Plaintiff requested that the Court deny Defendants' summary judgment motion, or postpone ruling on it, pursuant to Rule 56(d), claiming that certain discovery remains outstanding and is necessary to his opposition.  Plaintiff filed a corresponding motion to compel the disclosure of the same evidence.  Specifically, he claims to need more complete Avatar survey data, more native-format electronic data related to Patricia's electronic health records, more data reflecting communications between CVMC and the pharmacy that produced the prescription bottle label misidentifying Ms. Van Dyke as a doctor, and the text of generic appointment reminder messages sent to patients.

Plaintiff's request is denied as none of the disputed discovery would have any material impact on the determinative issue of reliance addressed above.  While they

17

may provide additional evidence of possible misrepresentations, they would do nothing to advance Plaintiff's claim of reliance. Accordingly, the Rule 56(d) request is denied.

Similarly, as the discovery sought largely concerns the misrepresentation claims dismissed in this Order, the Court sees no basis to grant the motion to compel. There is one exception. The Court believes the request for native format electronic evidence concerning Patricia's visit potentially may provide evidence concerning Plaintiff's remaining claims. On the other hand, Defendants have produced an affidavit indicating that the requested evidence does not exist.

The Court will deny the motion to compel as to that discovery without prejudice. The Court assumes counsel have conferred since the Defendants' response regarding the existence of such evidence. If there remains a dispute on the point, Plaintiff may take a deposition to confirm whether such evidence exists. If it exists and Defendants fails to produce it, the motion may be renewed.

<u>Conclusion</u>

For the reasons set forth above, Defendants are entitled to summary judgment on Count 5 (negligent misrepresentation); Count 6 (negligence per se); Count 7 (violation of the CPA); Count 8 (intentional misrepresentation); Count 9 (breach of contract and the duty of good faith and fair dealing); Count 10 (violation of the Lanham Act); Count 11 (*respondeat superior*); Count 14 (civil conspiracy); and Count 15 (punitive damages). Defendants are further entitled to summary

18

judgment on Counts 2, 3, and 4 (medical malpractice) but only to the extent that those counts include misrepresentation framed as an item of medical malpractice.

The Counts remaining in the case at this time are: Count 1 (wrongful death); Counts 2, 3, and 4 (medical malpractice); Count 12 (negligent supervision); and Count 13 (informed consent).

Plaintiff's motion to compel is denied, except as to the request for native format evidence, which is denied without prejudice.

The Court will set a brief status to discuss whether an attempt at mediation at this stage would be appropriate and, if not, what options are available to bring the matter to trial.

Dated this 12th day of May, 2021, at Barre, Vermont.

Timothy B. Tomasi
Superior Court Judge